IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TENNESSEE
WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,  )<br>  )<br>  Plaintiff,  )<br>  )<br>v.  )<br>  )<br>JOHNNIE WILLIAMS,  )<br>  )<br>  Defendant.  )<br>  ) | CR No. 10-20174 |

## POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS

**COMES NOW**, defendant, Johnnie Williams (hereinafter "**Mr. Williams**"), pursuant to Title 18, *United States Code Appx* § 6A1.3 and LCrR32.1(d), and identifies what appears to be disputed sentencing factors.

Mr. Williams, through the undersigned, has had contact on multiple occasions with the United States Attorney's Office concerning the instant case and, more particularly, about the appropriate, if any, sentence to be adjudged against Mr. Williams. Immediately prior to filing this position statement, the undersigned has been unable to reach Mr. Fabian, the Assistant United States Attorney assigned to prosecute Mr. Williams based on Mr. Fabian earlier advisement that he would be on leave. Nonetheless, previous contact with Mr. Fabian has surfaced these disputes which Mr. Williams believes to exist. This contact is verified by correspondence attached collectively as **Exhibit A hereto**.

In addition, by letter from Mr. Williams, through the undersigned, dated December 3, 2010 and response thereto received by the undersigned on December 6, 2010, Mr. Williams respectfully expressed to the assigned Probation Officer observations concerning the Presentence Report provided to Mr. Williams. This, too, evidences the dispute addressed by this pleading and is attached as **Exhibit B hereto**.

To avoid redundancy, Mr. Williams will not repeat, in the body of this position statement, facts and opinions stated in the attached exhibits.

Evidencing the urgent societal concerns with respect to the toxic pollution of the environment, in such a way as to endanger the health and safety of human beings, damage to property and the atmospheric environment where people must live is a true and exact copy, attached as **Exhibit C hereto**, of an article entitled "TOXIC SHOCK, Sierra Club Report Names the 10 Worst Polluters In Shelby County." This article was published in the Memphis Flyer, October 14-Ocotber 20, 2010 edition, pages 18-20.

The point here is that Mr. Williams wishes it be known that Mr. Williams does not underestimate the importance of the statutes involved in the instant case and is aware of the public interest to eliminate pollution of the environment by toxins.

From the standpoint of Mr. Williams, perhaps, the most important issue is that the Court be accurately informed as to precisely what the acts/omissions of Mr. Williams were that resulted in his indictment and his freewill guilty plea. In the arena of "hazardous wastes," many unfamiliar and ominous terms are customary.  Very intelligent persons hearing those words are unable to comprehend the exact significance, in day-to-day realities, what is being conveyed by the terminology.

The verbiage is technical language unique to experts in chemistry, biology, microbiology and other scientific fields. Because of the nature of our system, persons who are not sufficiently expert to truly comprehend the pragmatics, are routinely called on to enforce laws pertaining to these highly technical fields.

The result is that general information about the impact that can result from these toxins, with both salutary and harmful properties, that filter in dangerous ways into the environment are taken for granted, accepting the word of persons claiming the expertise to state opinions about the subject.

Neither Mr. Williams nor the undersigned claim the expertise to accurately evaluate exactly what "hazard" is presented by what "use/misuse" of what "hazardous" material in a particular situation is.

All either Mr. Williams or the undersigned can do is take the word of what others claiming expertise state about the subjects. Respectfully, the undersigned suggests that the same is true as it relates to most those making up United States Attorney's Office and the law enforcement community called on by our system to enforce laws based on opinions of persons who claim to be expert enough to express opinion, on point.

Thus, when the United States Environmental Protection Agency ("EPA"), through its counsel, David Harbin, Esq., and its investigators Brenita Richardson and Steve Spurlin, advised the undersigned of the desire of EPA to take the sworn oral deposition of Mr. Williams, Mr. Williams welcomed the opportunity.

On August 24, 2010, Mr. Williams sat for his sworn oral deposition for what was essentially all day. During the deposition, Mr. Williams was questioned by Mr. Harbin, Mr. Spurlin, Ms.

Richardson and the undersigned. A true and exact condensed copy of the deposition and an outline of the deposition are attached as **Exhibit D hereto**. This, Mr. Williams submits as a statement of the realities on the ground relative to the facts leading up to his indictment and Mr. Williams' guilty plea.

As the transcript which is Exhibit D hereto indicates, by invitation of Mr. Williams, Mr. Harbin and Ms. Richardson spent as much time as they wished in Mr. Williams' offices, without counsel, going through whatever books and records they wished with Mr. Williams and his staff providing whatever assistance was asked. Likewise, Exhibit D hereto indicates that Mr. Williams committed to gather additional information and documents to provide EPA. This commitment was fulfilled.

What is not revealed by Exhibit D hereto is the request of EPA for the undersigned and Mr. Williams to assist EPA in locating and making available any other persons EPA requested to come forward and give a sworn oral deposition. To this end, at the offices of the undersigned, Glover Gray, Michael Williams, George Roebuck and James Wilkerson sat, without counsel, for sworn oral depositions by EPA providing unrestricted information in answer to questions put by Mr. Harbin, Ms. Richardson and Blake Sterling.

Exhibit D hereto is the only sworn deposition by Mr. Williams recounting the acts/omissions about which EPA was concerned.

Through the undersigned, Mr. Williams has inquired as to whether EPA has any information that contradicts anything to which Mr. Williams testified, and EPA has expressed no reservations about any information provided by Mr. Williams. Likewise, through the undersigned, Mr. Williams has continuously made himself available to augment or otherwise supply any additional information

said by EPA to be needed or to be further questioned as to any other or new inquiry EPA might have.

For reasons sufficient to the Probation Officer, neither the fact that the transcript (Exhibit D hereto) nor any of the content of Exhibit D hereto appears in the Presentence Report, even though the undersigned appeared and personally delivered a copy with an explanation for how it came into existence.

<u>On another subject</u>, Mr. Williams wishes respectfully to address the Court concerning cleanup costs; especially, the extent to which cleanup costs are said to impact sentencing.

The issue relative to the acts/omissions in this case, from the outset, was solely a civil matter involving the request of the Tennessee Department of Environment and Conservation (hereinafter "**TDEC**") requiring Mr. Williams to identify for TDEC what was on the premises and to provide a plan of implementation to be executed by Mr. Williams to remediate the premises, if Mr. Williams discovered what the law classified as hazardous materials.

Attached as **Exhibit E hereto** is a true and exact copy of a letter, dated May 10, 2007, on the stationery of Pickering, addressed to Mr. Williams and signed by the Senior Project Manager for Pickering Environmental Consultants, Inc. The letter is a quote offering to provide the service necessary for Mr. Williams to meet the requirements of TDEC. Appearing on Exhibit E hereto is the signature of Mr. Williams, dated May 10, 2007, accepting the offer from Pickering.

Before the contract was executed, EPA entered the premises, made its own assessment and did cleanup.

What caused the civil actions to inflate into criminal proceedings is not known to Mr. Williams.

That aside, the civil proceeding involving Mr. Williams continued unabated and has, to this day, run parallel with the criminal proceeding. The civil proceedings have involved ongoing contact between Mr. Williams and EPA with respect to collection of what EPA has claimed to be the cleanup costs. Mr. Williams and EPA, following the rules and regulations governing such interaction, have had disputes with respect to whether what is claimed by EPA to be cleanup costs are actually cleanup costs and, if cleanup costs, whether the costs are reasonable. This dispute between Mr. Williams and EPA, though not contentious, remains unresolved.

Additionally, the statutes give EPA authority to collect cleanup costs from any persons/entities that contributed to the creation of what EPA incurred costs cleaning up. It is these efforts which precipitated the requests of EPA for Mr. Williams' deposition and other cooperation.

That EPA has identified third-parties that EPA deems obligated under the statutes to defray the cleanup costs is verified both by information provided, through the undersigned, to Mr. Williams by EPA and by the fact that certain attorneys representing certain persons contacted by EPA have contacted the undersigned seeking a copy of the transcript of Mr. Williams' deposition.

EPA persons with whom the undersigned has had contact, for and on behalf of Mr. Williams, reiterate that there is an insurmountable wall that exists, within EPA, to separate EPA civil proceedings from any criminal proceedings that may have grown out of the same investigation. As stated to Mr. Williams by EPA, there is no free flowing information from the EPA civil side to the EPA criminal side or to the Department of Justice or vice versa. This puts Mr. Williams in an awkward situation.

More particularly, on the criminal side, it is reported to the Court that the cleanup costs are in excess of $277,000. There is no attempt to justify what are claimed to be costs as reasonable,

and there is no information provided the Court with respect to what has been or is expected to be recovered by EPA.

Theoretically, EPA could have recovered every cent of what is determined to be reasonable costs incurred by EPA, and, on the assertion that the cleanup costs were in excess of $277,000, the Court would be expected to assess additional incarceration, presumably, on the assumptions that there had been or would not be any recovery and that the costs claimed are reasonable. Respectfully, Mr. Williams contends that this is unjustifiable.

<u>On another subject</u>, there is a missing element in what the Court has been informed with respect to the intellectual capacity of Mr. Williams. If the resources had been available to Mr. Williams, counsel would have had Mr. Williams psychologically tested, probably by a neuropsychologist, in order to create for the Court an accurate and reliable picture of Mr. Williams' intellectual capacities. This does not surface without more time in face-to-face interaction than most people have.

Such information is virtually irrelevant, Mr. Williams respectfully suggests, if a defendant is accused of robbing a bank, inflicting physical violence of any kind, kidnapping, peddling illegal narcotics or any number of other crimes. When it comes to sentencing for the crime to which Mr. Williams has pled guilty, Mr. Williams respectfully suggests that intellectual capacity is a large factor.

This is not to say that the capacity to satisfy the minimalist scienter requirements to be guilty is not possessed by Mr. Williams. The scienter requirements are general intent requirements that border on strict liability.

Mr. Williams respectfully suggests that what is the appropriate sentence for Mr. Williams' violation deserves more consideration than the law allows when assessing scienter.

Mr. Williams respectfully suggests that, had Mr. Williams had the financial resources to be psychologically evaluated, Mr. Williams would have been determined to be, pragmatically speaking, close to functionally illiterate. The only thing in the record to verify this, at this time, is the testimony of Mr. Williams in the transcript (p. 181, line 15 – p. 183, line 3; p. 185, lines 4-22) describing his abilities.

Mr. Williams has achieved success far, far beyond what society expects from persons who have no more intellectual skills and the collateral benefit of intellectual skills than Mr. Williams has. Mr. Williams presents a persona that communicates more than there really is to communicate, i.e., in the community and world in which Mr. Williams conducts himself, Mr. Williams is seen as a successful businessman and is a leader.

This is because Mr. Williams is a devoted Christian man with personal values for which he sacrifices whatever needs to be sacrificed to live life in accord with those values. Mr. Williams has passed on to his children and to others in his sphere of influence those values by modeling.

In addition, for decades, Mr. Williams has possessed a work ethic matched only by an elite few in society.

Mr. Williams gives of himself personally and his means to meet the needs of persons more needy than he. The list of Mr. Williams' accomplishments would take many pages and the testimony of hundreds to prove. Mr. Williams' character traits have long-since been a lifestyle for him.

Even more remarkable than this willingness to stand alone on convictions he has deemed to be right is the fact that Mr. Williams is able to remain a leader among other persons who have commendable values but differ with Mr. Williams strongly on that for which he stands almost alone among his peers.

All of this said, Mr. Williams can hardly write a legible sentence. Mr. Williams has a vocabulary that makes difficult his ability to engage in meaningful oral interchange on subject matter outside the limited scope of his knowledge.

Among many with whom Mr. Williams interacts as a leader, Mr. Williams appears to have the intellectual capacity to be a leader. Mr. Williams covers for himself in an attempt to avoid being seen as intellectually lacking. One of the ways Mr. Williams does this is have advisors who are friends accompany him who, essentially, speak for Mr. Williams and interpret for Mr. Williams if the context and the subject matter is outside the scope he knows to be the limits of his understanding.

Added to this, Mr. Williams has a speech impediment that makes his ability to communicate even harder than if the speech impediment was not a burden he had to carry.

It is not uncommon for Mr. Williams to do what has become an accommodating habit for him. When Mr. Williams engages in communication with other persons without the benefit of a friend or advisor to interpret, Mr. Williams is apt to say, virtually subconsciously, that he understands or, at least, carry on the conversation without stopping the conversants to clarify points and vocabulary that, in reality, are incomprehensible to Mr. Williams.

An example of the kind of cover that Mr. Williams, for years, has employed involves his response when asked concerning his educational background. He will say that he has "some"

college. This, quite literally, is true. Reality is, Mr. Williams attended part of one quarter in a community college and dropped out with non-passing grades.

The point here is that Mr. Williams is an amazing example of what a human being determined to be successful can accomplish having so little with which to work.

As a businessman, Mr. Williams found a niche at the very bottom of the food chain involving use of 55 gallon drums and pallets. Many manufacturers use substances in the manufacturing process that are contained in 55 gallon drums.

In times past, the 55 gallon drums were simply discarded as waste. With the onset of environmental concerns, manufacturers using substances transported in 55 gallon drums were required to clean the drums before discarding them, and the cleaning was required to be done with special care dictated by a plethora of state and federal rules and regulations. This caused manufacturers to find vendors to whom they could sell or give drums to be cleaned. Mr. Williams' niche was that.

Essentially, the cleaning process required the work ethic to which Mr. Williams was accustomed. However, Mr. Williams was confronted with countless pages of state and federal rules, regulations and statutes that a team of the best lawyers could not possibly understand with plausible debate. Mr. Williams did the best he could relying on the best advice he could find and afford.

To suggest for a second that Mr. Williams was knowingly polluting the environment to profit or to increase profits is so far off the charts that it is near slanderous. On the other hand, as indicated by Mr. Williams' guilty plea, Mr. Williams possessed the necessary scienter to meet the minimalist requirements to have violated the statute to which he has pled guilty.

There are other points to be made. But, to avoid further elongating this position statement, Mr. Williams will reserve further presentation until the sentencing hearing occurs.

                                            Respectfully Submitted,

                                            LARRY E. PARRISH, P.C.

                                            By: s/ Larry E. Parrish
                                                  Larry E. Parrish, BPR 8464
                                                  775 Ridge Lake Blvd., Ste. 145
                                                  Memphis, TN 38120
                                                  (901) 766-4388
                                                  parrish@parrishandshaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS has been forwarded by electronic means via the Court's electronic filing system to:

    John Fabian
    john.fabian@usdoj.gov

on the 17th day of December 2010.

                                                  /s/ Larry E. Parrish
                                                  Larry E. Parrish