ENVIRONMENTAL PROTECTION AGENCY

SUPERFUND SITE

_____

IN THE MATTER OF:

JOHNNIE WILLIAMS,

AMERICAN DRUM & INC.

_____

* * *

COPY

THE DEPOSITION OF JOHNNIE WILLIAMS

AUGUST 24, 2010

---

The deposition of JOHNNIE WILLIAMS, taken on behalf of the Environment Protection Agency, pursuant to Subpoena, on August 24, 2010, beginning at approximately 9:10 a.m. in the law offices of Parrish & Shaw, 775 Ridge Lake Boulevard, Suit 145, Memphis, TN.

This deposition is taken in accordance with the terms and provisions of the Federal Rules of Civil Procedure.

The signature of the witness is not waived.

---

APPEARANCES

For the Witness:

MR. LARRY E. PARRISH
Attorney at Law
775 Ridge Lake Boulevard
Suite 145
Memphis, Tennessee  38120
901.766.4388

For the Environmental Protection Agency:

MR. DAVID HARBIN
Attorney at Law
Assistant Regional Counsel
Sam Nunn Atlanta Federal Center
61 Forsyth Street, SEIMB
Atlanta George  30303-8960
404.562.8868

Also Present:

MR. STEVE SPURLIN
MS. BRENITA RICHARDSON

Reported by:

MS. MONNA J. MCCORMICK, RPR, CLR, CRR

Exhibit D

### INDEX

NAME: JOHNNIE WILLIAMS                    PAGE NUMBER:

EXAMINATION BY MR. HARBIN:        9
EXAMINATION BY MR. PARRISH:     145
EXAMINATION BY MR. HARBIN:      187

### EXHIBITS

| NO. | DESCRIPTION | PAGE NUMBER: |
|---|---|---|
| 1 | Response to the Tennessee Department of Environment & Conservation information request by American Drum & Pallet, Inc. | 71 |
| 2 | Information request from the Tennessee Department of Environment & Conservation dated April 5th, 2007 | 73 |
| 3 | Letter dated August 17, 2010 | 104 |
| 4 | Photograph | 109 |

### REQUESTED INFORMATION

| 1. | Current address of these employees | 32 |
|---|---|---|
| 2. | Names and address of drum hustlers | 39 |
| 3. | A glue company over in North Memphis. | 78 |
| 4. | Records | 90 |
| 5. | Person Dorothy called Williams called | 94 |
| 6. | Name of Memphis plant | 103 |
| 7. | Contact person for Rich Foods | 106 |
| 8. | Did drums from Leonard's Recycling contain residue | 110 |
| 9. | Name of airport | 117 |
| 10. | Confirm Flying Tiger name | 120 |

### INDEX (Continued)

#### REQUESTED INFORMATION

| 11. | Information on Asplundh | 128 |
|---|---|---|
| 12. | Shelter Insurance policy | 136 |
| 13. | Name of concrete company | 141 |
| 14. | Total revenue your company took in 2006 | 158 |

7

JOHNNIE WILLIAMS, having been first duly sworn, was examined and testified as follows:

MR. HARBIN:  This will be the deposition of Mr. Johnnie Williams.  EPA is taking this deposition pursuant to the authority of Section 122(e)(3) of the Comprehensive Environmental Response Compensation and Liability Act, commonly known as Superfund or CERCLA, C-E-R-C-L-A.

Again, the statute cite is 42 U.S. Code Section 9622(e)(3).  Mr. Williams was duly subpoenaed to appear here and testify.  The subpoena was issued by EPA pursuant to its authority under CERCLA.

The purpose of this deposition is to obtain information from Mr. Williams as related to the American Drum & Pallet Company Superfund site located in Memphis, Tennessee.

My name is David Harbin.  I'm an attorney with the United States Environmental Protection Agency, Region 4, in Atlanta, Georgia.  With me today is Brenita Richardson.  Brenita is the enforcement

8

project manager for American Drum & Pallet Company, Superfund site.  Brenita is also with the U.S. EPA, Region 4.

Also with me is Steve Spurlin who is the on-scene coordinator with EPA Region 4.  Brenita, Steve and I will be asking Mr. Williams questions this morning.

Mr. Williams, the reason we requested your presence here today is because we believe that you have information and knowledge pertaining to the American Drum & Pallet Company Superfund site in Memphis, Tennessee, the operations at that site and about companies which are involved with that site, including customers and clients of the American Drum & Pallet site.

This deposition is being conducted solely under our civil authority to investigate and clean up contaminated sites.  And I would like to note for the record that you are here present with your counsel, Mr. Larry Parrish, and I understand that Mr. Parrish may be here the whole deposition

Exhibit D

1  or may step out from time to time.
2          MR. PARRISH:  I might step out
3  from time to time or I might be here for the
4  full deposition.  I will reserve the right to
5  do either, but probably will be here for the
6  whole -- I would like to make a statement
7  before questions are asked of Mr. Williams.
8          MR. HARBIN:  Very good.  And,
9  Mr. Parrish, if you do step out from time to
10 time, you and your client consent to us
11 proceeding with the deposition and asking
12 Mr. Williams questions?
13         MR. PARRISH:  At the time I step
14 out, we will clarify that.  There may be
15 occasions when I need to step out and I'd ask
16 you to give me an opportunity to come back
17 for a few minutes.
18         MR. HARBIN:  Absolutely.
19         MR. PARRISH:  But we'll clarify
20 that on the record each time I step out, if I
21 step out.
22         MR. HARBIN:  Absolutely.
23              EXAMINATION
24 BY MR. HARBIN:

1  Q.      Mr. Williams, during the deposition,
2  if any of my questions are unclear,
3  confusing, don't hesitate to stop me, ask for
4  clarification.  I'll be happy to clarify or
5  you can consult with Mr. Parrish, your
6  attorney.  Don't hesitate to do that.
7          If you need to take a break at any
8  time, if you want to speak off the record,
9  that is not with the court reporter, just let
10 me know and we will go off the record.
11         You will be entitled to see and
12 review the deposition transcript before -- a
13 couple of weeks after the court reporter has
14 transcribed this deposition.  The only
15 corrections you will be able to make will be
16 limited to typographical errors or
17 misunderstandings.
18         If you realize that you remembered
19 something differently than when you were
20 sitting here today, that does not qualify as
21 a correction.  Please call me, tell me, but
22 we can't change today's testimony otherwise.
23         Now, do you have any questions before
24 we begin the questioning phase of the

1  deposition, Mr. Williams?
2  A.      No questions.
3          MR. PARRISH:  I would say for
4  Mr. Williams, we do reserve the right to read
5  and sign and to execute an errata sheet.
6          MR. HARBIN:  Absolutely.
7  Absolutely.
8          And for the record, we were supposed
9  to review records yesterday here in
10 Mr. Parrish's office.  We were unable to do
11 that.  And to review the records, we went out
12 to the American Drum & Pallet Company site.
13         We did spend the day out there
14 reviewing the records of the company.
15 Mr. Williams was there.  We had the consent
16 of Mr. Parrish to be out at that site without
17 Mr. Parrish's presence and wanted to make it
18 clear that we were out there under our civil
19 investigation authority.
20         Mr. Parrish, would you like to make a
21 statement?  And -- I'm sorry.  And we did
22 make a tape-recording of Mr. Parrish talking
23 to Mr. Williams, getting Mr. Williams'
24 consent to review those records at American

1  Drum & Pallet Company site without
2  Mr. Parrish yesterday.
3          MR. PARRISH:  And I will affirm
4  that that's a true statement.  We are
5  transcribing the tape-recording, and I've
6  informed Mr. Harbin that we will provide him
7  a transcription of that tape-recording and
8  that tape-recording will accurately reflect
9  our conversation with Mr. Williams.
10         Mr. Harbin assured me yesterday that
11 there is a Chinese wall between the civil
12 division and the criminal division and that
13 this is a civil matter only.
14         And Mr. Williams, though he was
15 subpoenaed, as you said earlier, we agreed to
16 come without a subpoena.  He's not here under
17 compulsion of a subpoena.
18         The subpoena was served, but we
19 agreed to come before then and would have
20 been here with or without the subpoena, and
21 Mr. Williams is here to cooperate.  There is
22 nothing that he intends to withhold.
23         And I think, as I spoke with him this
24 morning, he affirmed t                   that

Exhibit D

14

1   yesterday at his site; he told you-all to
2   look and see whatever you wanted to see and
3   that he was as helpful as he could be to you,
4   and he will continue to do that.
5          And that will be true if you need to
6   follow up after today, we're available.  And
7   I will probably stay here for the deposition,
8   and if not, Mr. Williams has given me consent
9   after full advice this morning.  And,
10  Mr. Williams, I do have your permission to
11  leave.
12          THE WITNESS:  Oh, yeah.
13          MR. PARRISH:  And you will
14  continue to answer questions whether I'm here
15  or not, if I choose to leave?
16          THE WITNESS:  Yeah.
17          MR. PARRISH:  All right.  Thank
18  you.
19          MR. HARBIN:  Thank you,
20  Mr. Parrish.
21  BY MR. HARBIN:
22  Q.    Would you please state your name?
23  A.    Johnnie J. Williams.
24  Q.    And your home address, Mr. Williams?

1   A.    1863 South Wellington.
2   Q.    And your telephone number?
3   A.    Work number or home number?
4   Q.    Both, as a matter of fact.
5   A.    Work number, 948-1576.  Home number,
6   774-4456.  Both area code 901.
7   Q.    And would you state your educational
8   background, Mr. Williams?
9   A.    High school and a year of Coahoma
10  Junior College.
11  Q.    And where did you go to junior
12  college?
13  A.    Clarksdale, Mississippi.
14  Q.    Who is your present employer?
15  A.    American Drum & Pallet.  That's what
16  you talking about?
17  Q.    Yes, sir.  Are you self-employed?
18  A.    I'm self-employed, yeah.
19  Q.    You're self-employed?
20  A.    Uh-huh.
21  Q.    And do you have -- under your
22  self-employment, is that under your name,
23  Johnnie Williams?
24  A.    Well, American Drum and Inc.

15

1   Q.    So you're employed by American Drum
2   and Inc.?
3   A.    Uh-huh.
4   Q.    And you're also self-employed?
5   A.    Uh-huh.
6   Q.    What is your current title with
7   American Drum and Inc.?
8   A.    Vice president and sales manager.
9   Q.    And do you have a title under your
10  self-employment?
11  A.    That's it.
12  Q.    So we're combining the two,
13  self-employment and American Drum & Pallet,
14  Inc.?
15  A.    Uh-huh.
16  Q.    We'll just -- for the sake of this
17  deposition, we'll just call it American
18  Drum & Pallet, Inc.
19  A.    Okay.
20  Q.    What is your responsibilities with
21  American Drum & Pallet, Inc.?
22  A.    Mostly out selling, out selling.
23  Q.    And what do you sell?
24  A.    Drum, pallet.

16

1   Q.    Are they new, are they used, are they
2   reconditioned?
3   A.    Reconditioned.
4   Q.    Reconditioned?  How long have you
5   been employed with American Drum & Pallet,
6   Inc.?
7   A.    Ever since 2'03.
8   Q.    Has your title always been the same,
9   vice president and sales?
10  A.    As far as I know.
11  Q.    Since 2003?
12  A.    Uh-huh.
13  Q.    And have your responsibilities always
14  been the same since 2003?
15  A.    Yes.
16  Q.    Mr. Williams, we're talking about two
17  separate companies.  I understand that there
18  is a company American Drum & Pallet Company,
19  Inc. -- American Drum & Pallet Company, Inc.?
20  A.    That's the same.
21  Q.    As American Drum & Pallet, Inc.?
22  A.    Uh-huh.
23  Q.    One was incorporated in Tennessee,
24  American Drum & Pallet Company, Th

Exhibit D

18

```
1    A.    Uh-huh.
2    Q.    That was incorporated in Tennessee,
3    correct?
4    A.    Well, as far as I know.  I didn't do
5    the paperwork.  Somebody else did the
6    paperwork.  As far as I know, it was.  I
7    think incorporated in Tennessee.  It probably
8    then went to -- what other place, some other
9    place out of town.  Delaware, I believe.  I'm
10   not for sure.
11   Q.    And that was American Drum & Pallet,
12   Inc. --
13   A.    Uh-huh.
14   Q.    -- was incorporated in Delaware?
15   A.    In Delaware, uh-huh.
16   Q.    And so we have American Drum & Pallet
17   Company, Inc. that was incorporated in
18   Tennessee?
19   A.    Uh-huh.
20   Q.    And then we have American Drum &
21   Pallet, Inc. that was incorporated in
22   Delaware?
23   A.    Yeah.  I think American Drum, Inc.
24   probably then went to Delaware.  I had an
```

```
1    attorney, Paul Springer, did it.  And he was
2    the -- so, yeah.
3    Q.    Under both of those companies, were
4    your -- was your title the same?
5    A.    Yeah.  As far as I know, uh-huh.
6    Q.    And were your responsibilities the
7    same?
8    A.    The same.
9    Q.    As you identified previously?
10   A.    Right, uh-huh.
11   Q.    Let's talk about American Drum &
12   Pallet Company, Inc., the Tennessee
13   corporation, the first corporation.
14   A.    Okay.
15   Q.    Who were the corporate officers of
16   that company?
17   A.    Me, my son and my daughter.
18   Q.    And who are they?  Who is your son?
19   A.    Michael Williams and Angela Williams.
20   Q.    And Michael Williams -- you -- what
21   was your role?  What was your title as
22   corporate officer?
23   A.    Sales and vice president.
24   Q.    And who -- what was Mr. Williams'
```

19

```
1    title?
2    A.    My son's title was --
3    Q.    Michael Williams.
4    A.    Michael Williams' title was driving a
5    truck and worked in the plant.
6    Q.    Under corporate -- the normal
7    corporate structure is president, vice
8    president and treasurer.
9    A.    Uh-huh.
10   Q.    Do you remember who was the president
11   of American Drum & Pallet Company, Inc.?
12   A.    Michael Williams was.
13   Q.    And Angela Williams?
14   A.    She was a whole officer, officer,
15   like secretary.
16   Q.    Was she the treasurer?
17   A.    No.  Michael was the treasurer and I
18   was the treasurer -- assistant treasurer.
19   Q.    Who were the shareholders of American
20   Drum & Pallet Company, Inc.?
21   A.    I have to look at the papers.  Now,
22   Gray come in, did the paperwork, G. Gray.  He
23   did most of our paperwork.
24   Q.    What was his name again?
```

20

```
1    A.    G. Gray.  I think you met him
2    yesterday.
3    Q.    G. Gray?
4    A.    Uh-huh, Glover Gray.
5    Q.    And Mr. Gray would know the
6    shareholders of American Drum & Pallet
7    Company, Inc.?
8    A.    Yeah, uh-huh.
9          MR. PARRISH:  For the record, if
10   you don't understand, it might be better just
11   to interrupt and get -- I don't understand a
12   lot of what he says myself, and so don't
13   hesitate, it's your deposition.
14         MR. HARBIN:  Absolutely.
15         MR. PARRISH:  But I would say
16   it's better to get that cleared up now than
17   later.
18         (An off-the-record discussion
19   was held.)
20   BY MR. HARBIN:
21   Q.    And I think I am getting this
22   correctly, but you were employed also with
23   American Drum & Pallet, Inc.?
24   A.    Yes, sir.
```

Exhibit D

Q.      And when did you first become
employed with American Drum & Pallet, Inc.?
A.      I believe 2'03.
Q.      And your title and responsibility
were --
A.      Remained the same.
Q.      -- the same --
A.      Right.
Q.      -- as under American Drum & Pallet
Company, Inc.?
A.      Uh-huh.
Q.      That's correct?
A.      Yes, sir.
Q.      Who were the corporate officers of
American Drum & Pallet, Inc., the Delaware
corporation?
A.      Michael and Glover Gray and my
daughter.
Q.      And what position did Glover Gray --
A.      He's the comptroller and did all the
paperwork.
Q.      And, again, the shareholders of
American Drum & Pallet, Inc., the Delaware
corporation, can you identify them?

A.      Myself, Michael and my daughter and
Glover Gray.
Q.      Were the shareholders?
A.      Shareholders, yes.
Q.      Do you know the interest, the
percentage of interest that each of the
shareholders held?
A.      No, sir, I don't.
Q.      Were you employed with Drums,
Incorporated?
A.      No.
Q.      Are you familiar with Drums?
A.      Yes, sir.
Q.      How are you so familiar with Drums,
Incorporated?
A.      Because my nephew Roebuck had Drums,
Incorporated.
Q.      Say his name again, please.
A.      George Stanford Roebuck, like Sears
Roebuck.
Q.      Sears Roebuck?
A.      Uh-huh.
Q.      Did Drums, Incorporated operate at
the 806 Walnut Street facility?

A.      I think so.  I was gone at the time,
but I think they did.
Q.      Did American Drum & Pallet Company,
Inc., the Tennessee corporation, operate a
business at 806 Walnut Street in Memphis,
Tennessee?
A.      Yes, sir.
Q.      Describe that business.
A.      It was the same as the American Drum
and Inc. and it's --
        (Reporter clarified.)
A.      It's come together, what happened.
The first one we got, we got it -- the
charter through Tennessee, then we changed it
and got it through Delaware.
Q.      Yes, sir.
A.      The same.  Uh-huh.
Q.      Describe the business that was --
that American Drum & Pallet Company -- or
that American Pallet and -- I'm getting
confused -- American Drum & Pallet, Inc.
operated at 806 Walnut Street.
A.      Drum and pallet, the same.
Q.      What do you mean by drum and pallet?

A.      That's what we did.  We recycled
drums and pick up and rebuild pallets.
Q.      Would you describe the operations?
A.      Well, we recycle drums and sell them
and fix up pallets and sell them.
Q.      Was it limited to drums?  Did it
include tanks and other kinds of containers?
A.      Yeah, uh-huh.
Q.      Would you --
A.      Tote tank, T-O-T-E, tote tank.  They
call it -- a lot of them call it big drum.
Q.      What kind of containers did you
clean?
A.      Fifty-five-gallon drum.
Q.      Was it strictly to just 55-gallon
drums or were that other containers?
A.      And tote tank.
Q.      Were there smaller containers that
you cleaned?
A.      Thirty-gallon drums.
Q.      Were those metal or plastic?
A.      Both.
Q.      Could you identify the dates that
American Drum & Pallet, Inc. _____ ___ __ ___

Exhibit D

1  location?
2  A.      No, I can't.  I could get it for you.
3  I can't remember what that is.
4  Q.      What were your hours of operations?
5  A.      From 8:00 to 4:00, 4:30.
6  Q.      How many employees did American
7  Drum & Pallet, Inc. have?
8  A.      We mostly was season.  We did mostly
9  contract, contract work.  But whenever we get
10  audited, we bring somebody in, sometimes we
11  work eight hours, sometimes work four hours,
12  six hours, sometimes work 10 to 12 hours to
13  get the orders out.
14  Q.      And how many employees would you
15  have?
16  A.      Say six, seven, something like that.
17  Q.      And you describe that as seasonal --
18  A.      Uh-huh.
19  Q.      -- or when you would get a contract?
20  A.      Right.  Get an order, we called it an
21  order.
22  Q.      Would you describe what you mean by
23  seasonal?
24  A.      Season meaning, like, this time

1  during the -- anywhere between June, July,
2  August, September when most farmers and
3  things -- you know, people weighs stuff like
4  corn, bean, cotton.  That's the season.
5  Q.      Say that again, Mr. Williams.  What
6  do you mean by seasonal?
7  A.      Seasonal mean anywhere from July to
8  September when agriculture like corn and
9  beans, cotton, whatever, people -- you know.
10  Q.      And how did that relate to your
11  container-cleaning business?
12  A.      ' I don't know.  But that's when most
13  of the people ordered the drums, during the
14  season.  They don't order too much in the
15  wintertime.
16  Q.      So you operated on a business where
17  drums were ordered?
18  A.      Uh-huh.
19  Q.      And they would call you?
20  A.      Call you -- call me, yeah.
21  Q.      And order cleaned or reconditioned
22  drums?
23  A.      Right, uh-huh.
24  Q.      And that happened mostly, as you

1  described, seasonally --
2  A.      Uh-huh.
3  Q.      -- during June, July and August,
4  during the agricultural season?
5  A.      Mostly, mostly.
6  Q.      Were there any other seasons?
7  A.      I can't remember.  You know, it goes
8  all the time, but most of the people, when it
9  beautiful out -- you know.
10  Q.      And you mentioned contracts as well.
11  What did you mean by contracts?
12  A.      Well, what I mean, when somebody else
13  get a contract, see, I was -- we just was a
14  small drum operator.  They mostly give a
15  contract to the other big -- like Memphis
16  Drum, Tennessee Container, and they only call
17  us when they couldn't fulfill what they want
18  and we did.
19  Q.      So who would call you?
20  A.      A company like Farrell Calhoun or
21  Dixie Chemical or something like that.
22  Q.      Would Memphis Container call you?
23  A.      We dealt with Memphis Container.
24  They run the big, big outfit.  They real big.

1  Q.      And what do you mean by we dealt with
2  them?
3  A.      Well, they may call and say they
4  short a drum and I had the drum.  They would
5  get them.  We do the same thing with them.
6  Q.      And you mentioned another drum
7  container company.
8  A.      Tennessee Container.
9  Q.      Did you deal with them the same way?
10  A.      Same way.
11  Q.      And they would call you?
12  A.      Uh-huh.  And we'd pick up drums from
13  Greif Brother, but Greif Brother closed down,
14  though.  I'm saying they don't -- came back
15  in town, bought Memphis Drum out now.  They
16  came back through a year or two ago,
17  bought Memphis Drum.  They was one of the
18  biggest in the world.
19  Q.      Now, would they supply you with the
20  drum or would you supply them with the drum?
21  A.      Well, you know, when you in business,
22  you swap out.  They may have something I need
23  and I may have something they need.
24  Q.      Would you expl

**Exhibit D**

1    further, Mr. Williams?
2    A.    Okay.  Greif Brother may need 200
3    30-gallon drums.  He may not have -- may not
4    have but 150, and he may call me because I
5    have 50 30-gallon, and I tell him yeah.
6    That's how business swaps out here.
7    Q.    These container companies, did they
8    ever supply you with drums to be cleaned?
9    A.    No.
10   Q.    And for American Drum & Pallet
11   Company, Inc., the Tennessee corporation, was
12   the business the same as American Drum &
13   Pallet, Inc.?
14   A.    Same.
15   Q.    The very same operations?
16   A.    Same operation.
17   Q.    It operated at the same location?
18   A.    Yes, sir.
19   Q.    And it operated the same hours --
20   A.    Mostly.
21   Q.    -- of operation?
22   A.    Mostly, yes, sir.
23   Q.    Was there a difference in hours that
24   American Drum & Pallet Company, Inc. and

1    American Drum & Pallet, Inc. operated?
2    A.    I can't remember.
3    Q.    Were the employees the same?
4    A.    Yes, sir.
5    Q.    And were the number of employees the
6    same?
7    A.    Vary.  May vary, may use four or five
8    this day and seven, eight the next day, you
9    know, depending on how the order come in.
10   Q.    Do you have a list of those
11   employees?
12   A.    I could get them for you.
13   Q.    Who were your main employees for both
14   companies?
15   A.    James Wilkerson.
16   Q.    And who is he?
17   A.    He's one of the supervisors, did most
18   everything at the plant that needed to be
19   done on the inside.
20   Q.    And how long did he work?
21   A.    Oh, he's been there a long time.
22   Q.    Can you name other employees?
23   A.    Leroy Smith.
24   Q.    And what was his title?

1    A.    Mostly truck driver.
2    Q.    Has he been with you a long time?
3    A.    Long time.
4    Q.    Mr. Wilkerson and Mr. Smith, about
5    how long have they been with you?
6    A.    Well, Wilkerson with me -- I guess we
7    been together about 20 years.
8    Q.    About 20 years?
9    A.    Uh-huh.  Leroy Smith with me about
10   eight.
11   Q.    Can you name any other employees
12   that's been with you?
13   A.    Yeah.  Charles Wilkerson.  Got that,
14   Charles Wilkerson?  Dorothy Williamson,
15   Dorothy Williamson.
16   Q.    And how about Mr. Charles Wilkerson,
17   what does he do?
18   A.    He was operating a machine.
19   Q.    And Ms. Delores?
20   A.    Same, operating machine, load truck
21   and load maintenance, you know, maintenance
22   stuff, yeah.
23   Q.    Are there any other employees that
24   have been with you a while?

1    A.    You know, I mean, all of them is in
2    and out.  Sylvester Wilkerson, Sammy Flake.
3    Q.    What did those two gentlemen do?
4    A.    Same.  Manual work, mostly manual,
5    you know.
6    Q.    Do you know the current address and
7    telephone number or at least the current
8    address of these employees?
9    A.    I could get it.
10   Q.    Are you familiar with American
11   Plastic Regrind Company?
12   A.    No.
13   Q.    Were you affiliated or connected in
14   any way with any other businesses that was
15   located at 806 Walnut Street?
16   A.    No.  I don't remember, no.
17   Q.    So the only two companies that you
18   were affiliated with at 806 Walnut Street is
19   American Drum & Pallet Company, Inc. --
20   A.    Uh-huh.
21   Q.    -- and American Drum & Pallet, Inc.?
22   A.    Uh-huh.
23   Q.    Were you at the 806 Walnut Street
24   facility on a day-to-day basis

Exhibit D

1    A.    Mostly.

2    Q.    And describe that.  What do you mean,

3    mostly?

4    A.    Well, I come in in the morning,

5    mostly.  Then I hit highway --

6          (Reporter clarified.)

7    A.    I go out in the street, try to sell

8    drums.

9    Q.    We've gone over this, Mr. Williams,

10   but I want to go over this one more time.

11   Who is Michael Williams?

12   A.    My son.

13   Q.    And what was his involvement with the

14   two companies?

15   A.    He was the president.

16   Q.    He was involved with Drums,

17   Incorporated?

18   A.    He may have been because I was gone

19   when Drums, Incorporated was going.

20   Q.    To your knowledge, was he involved

21   with any other companies that operated at 806

22   Walnut Street?

23   A.    To my knowledge, he had a T-shirt

24   company there.  He did T-shirts.  And that's

---

1    the only one I know.

2    Q.    Is he currently involved?

3    A.    No.  No, he is not there.

4    Q.    When did his involvement cease?

5    A.    About 2'05, 2'06.

6    Q.    2005, 2006?

7    A.    Uh-huh.

8    Q.    Is there a reason why his involvement

9    ceased?

10   A.    No.  He HAZ/MAT at FedEx.

11         (Reporter clarified.)

12   A.    He's HAZ/MAT.  He works at FedEx.  He

13   HAZ/MAT out there now, another job.

14   Q.    Say that again, Mr. Williams.

15   A.    He does HAZ/MAT work at FedEx.

16         MR. PARRISH:  Hazardous?

17         THE WITNESS:  No.  HAZ/MAT.  He

18   HAZ/MAT.

19   BY MR. HARBIN:

20   Q.    HAZ/MAT work at FedEx?

21   A.    Uh-huh.  He's a military guy.

22   Q.    What part of the military was he

23   involved or is he involved with?

24   A.    Army.

---

35

1    Q.    What's his rank?

2    A.    I don't -- he out now.  He was there

3    eight year.

4    Q.    But he's no longer with the Army?

5    A.    No, uh-uh.  He retired -- or he

6    didn't retire, but, you know, resigned,

7    whatever.

8    Q.    Who is Angela Williams?

9    A.    My daughter.

10   Q.    And her involvement with the two

11   companies?

12   A.    Yeah, she was a secretary.

13   Q.    Was she involved with Drums,

14   Incorporated?

15   A.    As far I know, I don't know.

16   Q.    Was she involved with any other

17   companies that operated at 806 Walnut Street?

18   A.    I don't think so.

19   Q.    Is she still involved with American

20   Drum?

21   A.    No.  No.

22   Q.    When did her involvement cease?

23   A.    Same time my son, about 2'05, 2'06.

24   She was in -- she work at Internal Revenue

---

36

1    now.  She got a good job with them.

2          (Reporter clarified.)

3    A.    She with Internal Revenue, IRS.  She

4    got a good job with them.

5    Q.    We've been talking about two

6    companies, Mr. Williams, American Drum &

7    Pallet Company, Inc. --

8    A.    Uh-huh.

9    Q.    -- and American Drum & Pallet, Inc.

10   A.    Uh-huh.

11   Q.    From this point on, when I say

12   American Drum & Pallet, I'll be speaking of

13   both American Drum & Pallet Company, Inc. and

14   American Drum & Pallet, Inc.; do you

15   understand?  Is that okay?

16   A.    Yes, sir.  Yes.

17   Q.    And also the phrase 806 Walnut Street

18   includes 0 Heiskell Place.  I understand that

19   806 -- there's two parcels to the American

20   Drum & Pallet facility.  One is 806 Walnut

21   Street and one is 0 Heiskell Place; is that

22   correct?

23   A.    Yes, sir.  That's what it say on tax

24   title, yes, sir.

**Exhibit D**

1  Q.    So when I talk about 806 Walnut
2  Street, I also mean to include the 0 Heiskell
3  Place parcel as well.
4  A.    Yes, sir.
5  Q.    Do you understand?
6  A.    Yes, sir.
7  Q.    We've gone over this.  But, again,
8  please list the scope of services provided by
9  the American Drum Company at 806 Walnut
10 Street facility.
11 A.    Recycle drum and recycle pallets.
12 Q.    Are they wood pallets?
13 A.    Yes, sir.  And plastic, wood and
14 plastic.
15 Q.    Are they a standard size?
16 A.    Different size.
17 Q.    What is the -- your range of service
18 for the American Drum at the 806 facility?
19 How far out did your operation go?
20 A.    We sell them to mostly Mississippi,
21 Tennessee, Arkansas.  That's most of the
22 range.
23 Q.    Did you have any beyond Mississippi,
24 Arkansas and Tennessee?

1  A.    We had some companies that would come
2  in, even from Atlanta, Georgia, some
3  environment people come in and buy drums, you
4  know, need drums.  They may come in from Ohio
5  and need 10, 15 drums.
6  Q.    You said you reconditioned drums and
7  pallets.  Mr. Williams, I'd like for you to
8  take me from start to finish, if you would,
9  on the cleaning process of a drum that was
10 used by American Drum at the 806 Walnut
11 Street facility.
12 A.    Okay.
13 Q.    And that is loading in, cleaning,
14 drying, drum removal, can you take me from
15 start to finish?
16 A.    Yes, sir.  Okay.  We pick up drums
17 and a lot of times people drop drums off,
18 like drum hustler.  People like hustle pallet
19 and paper and so on, you've got drum hustler,
20 too.
21 Q.    Did you say drum hustler?
22 A.    Yeah.  They pick up drum, they bring
23 them there and my guys unload them.  And what
24 we do, we clean them, we have the facility

1  there approved by the state and the city.
2  Q.    Hold on just a second, Mr. Williams.
3  Could you identify the drum who you would
4  say -- drum hustler, who were those?
5  A.    Like Mike, usually call them by first
6  name.  Mike, Jack, Jack Steper, Mike.  And
7  there are several other people.  They would
8  bring a drum in that I could sell, a pallet,
9  sold the drum to me, sold the Memphis Drum to
10 Tennessee Container, sold them to any drum
11 company.
12 Q.    Can you get their address and their
13 telephone numbers?
14 A.    Yes, I think I can.
15 Q.    And that was Mike and Jack?
16 A.    Uh-huh.
17 Q.    Do you remember any others?
18 A.    Not precisely because Jack and Mike
19 was the drum hustlers, but you had different
20 occasion people bring drum by and they'll
21 sell them, you know.
22 Q.    Continue on.  We were at bringing the
23 drums in.
24 A.    Okay.  Yeah, bring them in.  We stack

1  them up, and then what we do, we clean them.
2  After we clean them --
3  Q.    Did you have an acceptance program
4  for the drums?  How did you accept a drum?
5  A.    Well, what we do, we just have to
6  make sure that nothing is in them, that they
7  are clean, the weight, that they had to be
8  clean when they come in.
9  Q.    And what do you mean by clean?
10 A.    Well, they can't have no -- what you
11 call that -- nothing in them, you know.  It
12 has to be a clean drum.
13 Q.    And who was responsible for accepting
14 the drums?
15 A.    James Wilkerson.
16 Q.    Would they contain a residue in them?
17 A.    No.  They shouldn't have.  I don't
18 ever watch all of them.
19 Q.    Were they inspected for salvage, for
20 resale, for damage?
21 A.    I'm sure they were, yes, sir.  I'm
22 sure they were.
23 Q.    And who was responsible for that?
24 A.    James Wilkerson

Exhibit D

43

Q.    Do you know where these drums came
from?

A.    Some of them we did, some of them we
didn't.

Q.    And who brought the ones that you
didn't know where they came from?

A.    Mostly hustlers.

Q.    And that was who you turned -- you
say Mike?

A.    And Jack, uh-huh.

Q.    And you will be able to get me their
names and addresses?

A.    Yes, sir.

Q.    And telephone numbers?

A.    Uh-huh.

Q.    Let's continue on, Mr. Williams.
We're in the cleaning process now.

A.    Okay.  Then when we clean the drum,
what we'll do, we sand the label off --

      (Reporter clarified.)

A.    We sand the label off them, whatever,
the label on them, clean them, rough them
down so we can paint them.  And once we paint
them, we send them out.  Whenever we got an

order, we send them out.  And, see, we were
so small, we only did something like -- if we
did 50 drums a day, we were good.

      We wasn't nothing like Geo Cooper,
because, you know, Geo Cooper went out of
business.  They were the largest, along with
Memphis Drum.  They did something like 2 or 3
thousand drums a day.  We small.  We did
mostly manual.

      We didn't even have a forklift.  We
lift, we manual.  We wasn't the jewel of the
drum company.  We work.  You know, we work.
We wasn't like the big people, you know.

Q.    And about how often did you do 50
drums a day?

A.    Maybe a couple times a week.

Q.    And that was throughout the year?

A.    Yes, sir.

Q.    What cleaning agents or what cleaning
materials did you use to clean the drums?

A.    We use a soap that we got from Jack
Flint.  They make the detergent, soap, and we
used that.

Q.    And describe the cleaning process.

43

A.    The process was we had a machine
that -- what we do, put the drum up there and
had to pressure wash, clean them out.  Then
we had a -- approved by the City of Memphis
and the state, a permit, cleaning permit, a
sewer permit.  We're approved by the state
and the city on how we wash the drum.

Q.    And the only material that you used
was a detergent?

A.    Yes, cleaning solution that we got
from Jack Flint.

      MR. SPURLIN:  Mr. Williams, when
we were on-site and also in my discussions
with the city representative from the fire
department, you had a container of gasoline,
I believe, inside your facility.

      And I think -- did you use that?  I
think you had some rags, and you used maybe
the gasoline and rags in assisting in your
cleaning process.

      THE WITNESS:  Not cleaning --
yeah.  I'm sorry, wiping the drum down.  See,
before you paint the drum, you have to wipe
all the exterior off and make sure they were

44

clean.  Yeah, you wipe the drum down.

      MR. SPURLIN:  Prep the drum?

      THE WITNESS:  Uh-huh.

      MR. SPURLIN:  Okay.  Thank you.

BY MR. HARBIN:

Q.    And the drums were dried?

A.    Uh-huh.

Q.    Explain how you went through the
drying process.  Where was the drying
process?  What was the drying process?

A.    Okay.  Once you made the drum -- we
had a soak tank.  We soak the drum out dry.
And then what we do, we had a rag and
gasoline, will clean all the grit and stuff
off the drum so the paint would take.  We had
a rag, wipe them off, the drum off.

Q.    And did you say you had a tank that
you dipped the drum in to rinse it off?

A.    No.  We had a machine.  We put them
on the top of a tank.  We had a five-drum --
put up there for the pressure washer to wash
them out.  Then they go in the receptor tank.

Q.    And what was the receptor tank?

A.    The same as I [...]

Exhibit D

1  approved -- what you call it -- receptor
2  tank, what you wash the drum go down in -- it
3  was approved by the city.  I can't explain
4  that.
5      Q.      Did it contain any materials,
6  cleaning agents, anything like that?  What
7  did it contain?
8      A.      Just the water and then the soap that
9  we used to wash the drum out with.
10     Q.      What happened to the water in the
11 receptor tank?
12     A.      Go to a filtration system and go back
13 in it, in the sewer.
14     Q.      And what happened to the water that
15 you used for the cleaning process?
16     A.      That's what I say, go to filtration
17 system and go back in the sewer.  It was
18 approved by the city and the state.
19     Q.      So the cleaning process and the
20 receptor, they were all connected together --
21     A.      Uh-huh.
22     Q.      -- to the filtration?
23     A.      To the filtration, yes, sir.
24     Q.      Was there anything else connected to

1  the filtration system?
2      A.      No.  No.
3      Q.      And now we're at the drying process.
4      A.      Uh-huh.
5      Q.      How did you dry the drum?
6      A.      Well, I will soak them out in a soak
7  tank.
8      Q.      Say that again, Mr. Williams.
9      A.      We had a soak tank where, you know,
10 like water be on your floor and you get a wet
11 mop, soak the water up?  We had a soak tank
12 that sucks the water out the drum.
13         MS. RICHARDSON:  Vacuum?
14         THE WITNESS:  Yeah, vacuum.  Wet
15 vac, whatever you call it.
16 BY MR. HARBIN:
17     Q.      A vacuum?
18     A.      Yeah, a wet vac.
19         MR. PARRISH:  Are you saying
20 suck the water?
21         THE WITNESS:  Suck the water.
22 BY MR. HARBIN:
23     Q.      And where did that water go?
24     A.      We had a big -- what you call -- suck

1  the water out.  Then when it get full, we run
2  it down to the filtration system, same way
3  where the other water goes to.
4      Q.      So it went to the filtration system
5  as well?
6      A.      Yes, sir.
7      Q.      And then the containers were painted?
8      A.      Uh-huh.
9      Q.      Was there anything in between drying
10 and painting?
11     A.      No more than wipe them off, you know,
12 with a rag and gas.
13     Q.      And that's what Mr. Spurlin was
14 talking about?
15     A.      Yes.  Uh-huh.
16     Q.      Was there any other materials other
17 than gasoline used to wipe the drums off?
18     A.      No.  It's mostly gas.
19     Q.      Mostly gas?
20     A.      Yes, sir.
21     Q.      Did you use anything else?
22     A.      I can't remember nothing else we use.
23 That's the only thing we dry -- dry them.
24     Q.      And then the drums were painted?

1      A.      Uh-huh.
2      Q.      And can you explain the painting
3  process?
4      A.      Yeah.  We had a paint room, you know,
5  to paint them in.  And when they paint them,
6  they set them there to get dry.  And we
7  didn't do -- like I said, we didn't too much
8  paint.  We did mostly plastic.  As you see
9  the picture, plastic, all you do is clean
10 them, wipe them off and that's it.
11     Q.      And you said you did about maybe 50
12 to a hundred a day?
13     A.      Uh-huh.  50.
14     Q.      50 a day.  I don't want to put words
15 in your mouth.  50 a day?
16     A.      Uh-huh.
17     Q.      Were those drums and containers or
18 containers or which -- help me understand how
19 many drums versus how many containers you did
20 a day.
21     A.      Containers, you mean the tote tank?
22 I need you to be very -- because you got
23 drum, then you got -- a lot of people call
24 them tote tank, big drum.  Tote tank is

Exhibit D

50

```
1    250-gallon tote tank in the wire -- drum is
2    55-gallon or 30-gallon drum that's steel or
3    plastic.
4    Q.      Help me understand that -- when we
5    speak of drums, we're talking about --
6    A.      Fifty-five-gallon, 30-gallon drums.
7    Q.      And they could either be plastic --
8    A.      Or steel.
9    Q.      -- or steel?
10   A.      Yes, sir.  Or cardboard.
11   Q.      Or cardboard?
12   A.      Uh-huh.
13   Q.      Did you clean the cardboard?
14   A.      No.
15   Q.      But you did clean --
16   A.      Plastic and steel.
17   Q.      And steel?
18   A.      Yeah.
19   Q.      And you cleaned the tote tank?
20   A.      Tote tank.  They plastic and in a
21   wire cage.
22   Q.      And --
23           MR. PARRISH:  Wire?
24           THE WITNESS:  Wire cage.  You
```

```
1    see them on -- people haul them down the
2    street with washing cars and trucks and wire
3    cages.  That's called a tote tank.
4            MR. SPURLIN:  Tote tanks are
5    made out of plastic and they don't, in
6    themselves, have a lot of structural support,
7    so you put them in a reinforced wire cage
8    that will sit on a pallet, and it holds the
9    poly tank securely when it has liquids in it.
10   BY MR. HARBIN:
11   Q.      Okay.  Now, how -- and you cleaned
12   the tote tanks as well?
13   A.      Oh, yeah.
14   Q.      About how many tote --
15           MR. PARRISH:  Can I interrupt?
16   You heard Mr. Spurlin.  Did he accurately --
17           THE WITNESS:  He accurately --
18   yes.
19           MR. PARRISH:  Okay.  Excuse me.
20           THE WITNESS:  He was there.  He
21   knew what it...
22   BY MR. HARBIN:
23   Q.      About how many tote tanks did you
24   clean?
```

51

```
1    A.      If we do 10 or 15 a day, two to three
2    days a week, we're good.
3    Q.      And that was every week through the
4    year?
5    A.      Not every week.  Some weeks.
6    Q.      And about how many weeks per year
7    would you say?
8    A.      I would say something like about 40,
9    45 weeks of the year.
10   Q.      And the tote tank was cleaned under
11   the same method?
12   A.      Same method, uh-huh.
13   Q.      I want to go over this one more time,
14   Mr. Williams.  Let's describe the items, the
15   drums, the tanks, that American Drum cleaned
16   at the 806 Walnut Street facility.  Let's
17   describe the drums one more time.
18   A.      Okay.  55-gallon steel drum,
19   30-gallon steel drum, 55-gallon plastic drum,
20   30-gallon plastic drum and 250-gallon tote
21   tank.
22   Q.      And the steel drum and plastic drum,
23   did they have a top to them?
24   A.      Open head drum.  Tight head, you got
```

52

```
1    a bung -- two-inch bung, two-inch bung.
2            (Reporter clarified.)
3    A.      Uh-huh.  B-U-N-G, bung.  Screw-in.
4            MR. SPURLIN:  I think what he's
5    saying is a bung, a B-U-N-G.
6            THE WITNESS:  Yeah.
7            MR. SPURLIN:  It's the cap.
8            THE WITNESS:  Uh-huh.  You screw
9    it in.
10           MR. SPURLIN:  You screw in a cap
11   to the top of the drum.  A bung cap, they
12   call it; is that correct?
13           THE WITNESS:  Uh-huh.
14           MR. SPURLIN:  And he's referring
15   to what can also be termed closed-top and
16   open-topped drums.  A closed top means that
17   the drum is fixed to the body of the drum and
18   does not -- and the only part that comes off
19   for either taking out or putting in materials
20   is the bung cap.
21           And an open top is where you can take
22   the whole lid off the drum and they are used
23   to store different types of materials.
24           THE WITNESS:  Yeah.
```

Exhibit D

BY MR. HARBIN:

Q.     Is that correct, Mr. Williams?

A.     Yeah.

Q.     Is that accurate?

A.     Thank you.  That's accurate, yeah.

       (A recess was taken.)

BY MR. HARBIN:

Q.     Mr. Williams, you took me through the cleaning process and the painting process.

A.     Uh-huh.

Q.     Did you also grind drums?

A.     Yeah.

Q.     Containers?

A.     But we crush them.  We sold them to a grind place in Jackson.  See, a lot of drum that we didn't use -- we couldn't use like steel and plastic.  We sell them to the grind -- they grind them up.  What the name of that plastic place in Jackson, Tennessee?  I forget the name.  We sold a lot of plastic to them.

       And what we do, we had a crusher.  We crush drums and sell them to a company like Martin Brother in Mississippi.

---

Q.     And did you crush them at the facility?

A.     I helped.

Q.     I mean, not you, did American Drum crush the --

A.     Yeah.

Q.     You didn't grind them?

A.     You don't grind steel.  You grind plastic.  The plastic drum, we took them away and sold them to a plastic company that grind them and sent them over to China or wherever they sell them.

Q.     And who did you sell the steel drums to?

A.     Martin Brother.

Q.     Can you think of any other ones?

A.     Worley.  And another company close up on -- I forget, the big old place.  I think you-all closed them up or whatever.  I forget the name of the company over on -- the big iron company on Thomas.  I forget the name.

       MR. PARRISH:  Pigeon.

       THE WITNESS:  No, not Pigeon.  The big scrap yard over on Thomas.

---

BY MR. HARBIN:

Q.     Let's go over those companies again.  You said the first one was --

A.     Martin Brother.

Q.     Martin Brothers.  And where are they located?

A.     In Mississippi, Byhalia.  We sold scrap and drums over to them.  Worley Brothers.

Q.     And where are they located?

       MR. PARRISH:  Can you spell it?

       THE WITNESS:  I can't spell, Worley, no.  They were out on Florida and Crump.

BY MR. HARBIN:

Q.     And those were the steel drums?

A.     Those were steel drums, uh-huh.

Q.     What did you -- who did you sell the plastic drums to?

A.     To a plastic recycler in Jackson, Tennessee.  I forget -- I know where it is.  I don't have that with me.

       MR. SPURLIN:  Mr. Williams, would that company be Southeastern Recycling?

---

       THE WITNESS:  No.  KMI was out in -- out from Jackson.  We sold a lot of them to them.

       MR. SPURLIN:  You mentioned one in Greenfield maybe or somewhere in the Greenfield area.

       THE WITNESS:  In that area.

       MR. SPURLIN:  It's in the site file.

       MR. PARRISH:  S-I-T-E?

       MR. SPURLIN:  Yes.  I'm sorry.

BY MR. HARBIN:

Q.     You mentioned gasoline rags.

A.     Uh-huh.

Q.     What did you-all do with the gasoline rags?

A.     Put them in the drum.

Q.     And what did you do with the drum?

A.     That's what they haul off.

Q.     What they -- what EPA hauled off --

A.     Yeah.

Q.     --- when you spoke to Mr. Spurlin?

A.     Yeah.

       MS. RICHARDSON:  When the asked --

Exhibit D

1  question.  Before EPA came in and hauled
2  those off, the rags, what did you do with the
3  rags?  What would happen with the rags?
4              THE WITNESS:  They was in drums,
5  most of them -- the EPA hauled -- see, we
6  just started in 2'03.  Most of the drum, you
7  had trash and -- you know.
8              MS. RICHARDSON:  So there was no
9  disposal process for those rags with the
10  gasoline on them?
11              THE WITNESS:  No, there wasn't.
12              MS. RICHARDSON:  Okay.
13  BY MR. HARBIN:
14     Q.     And, Mr. Williams, you mentioned a
15  filtration system.
16     A.     Uh-huh.
17     Q.     Would you describe that filtration
18  system?
19     A.     The filtration system when you -- you
20  got a pump that pump the waterline in and go
21  to a tank, go to a filtration system, catch
22  all of the -- whatever you -- catch all
23  the -- everything, that sludge or whatever it
24  catches and hold it within the tank.  Then

1  the water will go back into the sewer.
2     Q.     And what comprised the filtration
3  system?  Describe the filtration system.
4     A.     Big old tank with a filter and stuff
5  in them.  Then you got a pump, it go to the
6  pump filtration system, and the water go to
7  the tank.  And once it's cleaned, it go back
8  in there.
9     Q.     Let me take this one step at a time.
10  The water from the --
11     A.     Washing the drum.
12     Q.     From washing the drums would go into
13  what?
14     A.     Go to --
15     Q.     Equipment?
16     A.     Go to a tank.
17     Q.     It would go to a tank?
18     A.     Uh-huh.  Pump, go to a pump first.
19  Go to the pump.  Then from the pump, then the
20  tank to the filtration system; from the
21  filtration system, back in the sewer.
22     Q.     It would go to a pump?
23     A.     Uh-huh.
24     Q.     And the pump would pump it in --

59

1  would pump it where?
2     A.     Into a tank.
3     Q.     And what size is the tank?
4     A.     Two hundred seventy-five gallon tank.
5     Q.     And what would happen to the water
6  then, after it was pumped into the tank?
7     A.     It would go to a filtration -- go
8  through the system, then go back in the
9  sewer.
10     Q.     Go through the system?
11     A.     Uh-huh.
12     Q.     What was the system?
13     A.     That's what I say, a tank with the --
14  to catch all -- whatever it's catching and go
15  back in the sewer.
16     Q.     I'm not understanding.  It would go
17  to a tank, a 230 --
18     A.     No.  Go to a pump first, then go
19  through the -- to the tank.
20     Q.     And then it would go through the
21  filtration?
22     A.     That is the filtration, the tank.
23     Q.     The tank is filtration?
24     A.     Uh-huh.

60

1     Q.     How would the tank -- how was the
2  tank a filtration system?
3     A.     Well, it catch everything, whatever,
4  you know.  If anything in there to catch it,
5  clean it and then go back into the sewer.
6     Q.     How would the tank clean?
7     A.     It had something in it that, you
8  know -- you know, it's hard -- I'm not a
9  mechanic, you know.  It was a -- it was
10  approved by the city and state, so I, you
11  know, I have to get you the method, how we
12  would do it.
13     Q.     Who operated the filtration system?
14     A.     It operate itself.  Once the guy who
15  washed the drum, it does it itself.
16     Q.     Did it contain chemicals?
17     A.     No, uh-uh.  It catch everything that
18  go through there.  It will dry whatever it
19  is.  When you wash them, that when the water
20  go to the pump, pump it from there, where the
21  washing -- then go to a tank, the
22  filtration system.  And before it go there,
23  in the sewer, it go to the tank and through
24  the system and go back in the sewer.

Exhibit D

**Page 62**

1  Q.   So it would go through a pump?
2  A.   Uh-huh.
3  Q.   Into a tank?
4  A.   They call it filtration system.
5  Q.   Was it just a tank?
6  A.   No.  It had some -- some like form or
7  something where they catch all the stuff so
8  the --
9        MR. SPURLIN:  Would it --
10       MR. HARBIN:  Go ahead.
11       MR. SPURLIN:  I was just going
12 to say, would you say that it had a screen?
13       THE WITNESS:  Something like
14 that, something like a screen, yeah.
15       MR. SPURLIN:  To catch solids?
16       THE WITNESS:  Solids, uh-huh.
17       MR. SPURLIN:  Did you have to
18 periodically clean the screen?  And if you
19 did, what did you do with the material you
20 cleaned off the screen?
21       THE WITNESS:  Put it in the
22 drum.
23       MR. SPURLIN:  Okay.  Thank you.
24 BY MR. HARBIN:

**Page 63**

1  Q.   You would take them to them for
2  cleaning?
3  A.   For cleaning, not for us, now.  We
4  sell the drum to them.
5  Q.   About how many drums did the
6  filtration -- when you cleaned the screen,
7  about how many drums did you fill with the
8  residue from the screen of the filtration
9  system?
10 A.   I say we maybe clean about one a
11 month, less than that.
12 Q.   I'm not understanding, Mr. Williams.
13 A.   It was one a month.
14 Q.   You cleaned about one a month?
15 A.   No.  The filtration -- the one that
16 come off the filtration system screen, one a
17 month.
18 Q.   You filled one a month?
19 A.   One a month, uh-huh.
20 Q.   Of the residue from the screen out of
21 the filtration system --
22 A.   Uh-huh.
23 Q.   -- did you ever make any kind of
24 analysis or determination as to what those

**Page 64**

1  So you would clean the screen?
2  A.   Uh-huh.
3  Q.   And you would put that residue in a
4  drum?
5  A.   In a drum.
6  Q.   What did you do with the drum?
7  A.   That's the one they hauled off.  It
8  wasn't many, because we didn't do no work.  I
9  tell you now, we didn't do nothing much.  Out
10 of a hundred percent of our drum come in, we
11 had something like about 40 percent we sold
12 to other people because we didn't have the
13 method of -- you know, we small.
14 Q.   Say that again.  About 40 percent --
15 A.   Will go out to other people like
16 Memphis Drum, Tennessee Container, Geo Cooper
17 before they closed.  We sold them to other
18 people.  They was using the drum.  We didn't
19 have to -- we didn't have the order.
20 Q.   Would you clean those drums?
21 A.   No, uh-uh.  They clean them.  We sell
22 them to them, they clean them.
23 Q.   They would come to your facility?
24 A.   Or we take them to them.

materials were that you put into that drum?
2  A.   Yeah, we got the -- we had a lab to
3  test all that before, uh-huh.
4  Q.   And who did that testing?
5  A.   We got it in the file somewhere.
6  I'll get it for you, though, L and -- some
7  lab company.  A&L Lab, I believe.
8  Q.   How often did you do the testing?
9  A.   They did -- A&L Lab did testing about
10 once every three months, 90 days.
11 Q.   And would you say the name of the
12 company again?
13 A.   I'm not for sure, now.  Let me give
14 the truth.  I think A&L Lab.  But I could get
15 it for you, though.
16 Q.   L&L?
17 A.   A&L.
18 Q.   A&L --
19 A.   Uh-huh.
20 Q.   -- Lab.  And you would have them come
21 out and they would test --
22 A.   Uh-huh.
23 Q.   -- what was in that drum?
24 A.   Right.

Exhibit D

66

```
 1   Q.   About once --
 2   A.   Every 90 days.
 3   Q.   Every 90 days.
 4   A.   Uh-huh.
 5   Q.   And when did that company start?
 6   A.   I wouldn't know.  I have to find out.
 7   Q.   Did you -- did A&L Lab start when
 8   American Drum started operating at that
 9   facility?
10   A.   Yeah, uh-huh.
11   Q.   So you employed A&L Lab in
12   approximately 2003?
13   A.   2004.  Before we started cleaning
14   drums, we would haul them in, sell them to
15   other drum broker, like the other company.
16   We transfer and sell them to another company.
17   Q.   Did those drums go through the
18   acceptance program, the ones that you brought
19   in and sold to other companies?
20   A.   What you mean, acceptance?
21   Q.   Were they -- did you look at them to
22   see if they were empty?
23   A.   Yes, sir.
24   Q.   Did they contain anything?
```

```
 1   A.   Yeah.
 2   Q.   Did they ever contain anything?
 3   A.   No, nothing.
 4   Q.   They were always empty?
 5   A.   Always empty.  Because, see, the
 6   company that we got them from made sure
 7   that -- we wasn't in chemical business; we're
 8   in the cleaning business.  They were
 9   responsible for their own chemical.
10   Q.   And who were the companies that you
11   got them from?
12   A.   We got them from -- I think I got a
13   list.  I can't think of them.
14   Q.   We'll go through that later on.
15   A.   Okay.
16   Q.   So there was -- you say that there
17   was an acceptance program at American Drum
18   for drums that were brought to the facility?
19   A.   Uh-huh.
20   Q.   And was there a standard applied for
21   the acceptance program?  Did you have any
22   kind of procedure for accepting drums and
23   tanks at the American Drum facility?
24   A.   Yes, sir.  We knew not to accept no
```

67

```
 1   drum with nothing in them.  Now, we had a
 2   company --
 3   Q.   Go slow, Mr. Williams.  Say that
 4   again, please.
 5   A.   They knew that we -- we told them not
 6   to accept nothing with nothing in them; all
 7   the drum have to be clean.  But we had a
 8   couple company that bring some drums and drop
 9   them off.  And they from down -- from
10   Mississippi, and I put them in a truck and
11   asked the company come back, pick up the
12   drum, and nobody came back to pick them up.
13       I think those the ones that Steve see
14   in the trailer there, were from some Flying
15   place in Mississippi, Minnow [sic] City,
16   Mississippi.
17   Q.   And those drums were brought by a
18   Flying company from Minnow [sic] City?
19   A.   Mississippi.
20   Q.   Mississippi?
21   A.   Uh-huh.
22   Q.   Do you know the name of that company?
23   A.   I think it on there, Tiger company, I
24   think.
```

```
 1   Q.   Tiger company?
 2   A.   Yes, sir.
 3           MR. SPURLIN:  Would it be Flying
 4   Tiger?
 5           THE WITNESS:  Flying Tiger,
 6   that's it.  Flying Tiger.
 7           MR. PARRISH:  Did you say Minnow
 8   City or mini city?
 9           THE WITNESS:  Mini city --
10   Minnow City, Minnow City.  M-I-N-E-R,
11   something like --
12           MR. PARRISH:  Mineral [sic]
13   City.
14   BY MR. HARBIN:
15   Q.   Were there any other containers that
16   were brought onto the American Drum facility
17   that you-all did not accept?
18   A.   Yes, sir.  Now, I have to get into
19   that.  I have to go back and look at the work
20   because we sent a lot of them back.
21   Q.   Do you remember the names of the
22   companies that sent those?
23   A.   No.  One company over there on
24   Chelsea.
```

68

## Exhibit D

1    Q.    Say that again.
2    A.    I forget -- I have to go by to get
3    the address.  It was a company on Chelsea, a
4    concrete place, Chelsea and then -- off
5    Chelsea and Bellevue.  They do a lot of
6    concrete.  They run a lot of drum back there.
7    They wouldn't come get them.  I took them
8    back over there to them.
9    Q.    And what did they contain?
10   A.    They contained something to clean --
11   they made concrete, brick, whatever they -- I
12   don't know what they were.
13   Q.    But it contained a cleaning agent?
14   A.    Cleaning agent, uh-huh.
15   Q.    And you took those back?
16   A.    Took those back, yeah.
17   Q.    Do you remember any other drums that
18   you did not accept?
19   A.    A lot of them we didn't accept.  But
20   I can't remember who, you know.
21   Q.    Were the drums inspected for state --
22   compliance with EPA standards or state
23   standards?
24   A.    I don't understand what you mean.

1    Explain what you mean.  If you mean
2    shipping --
3    Q.    Drum acceptance.
4    A.    Accepting shipment like 18 gauge, 18
5    gauge, so you can't only gauge -- you can --
6    only drums you could ship is one 18 gauge.
7    You need 18 gauge.  The 20 gauge, they come
8    in mostly -- a lot of full grade, you just
9    have them in the house to put water,
10   whatever, in.
11        The only thing that transportation
12   would ship are 18 gauge, and 20 in plastic,
13   certain gauge of plastic.
14        MR. PARRISH:  You're saying 18
15   gauge?
16        THE WITNESS:  Gauge, the steel.
17        MR. PARRISH:  That's the
18   gauge --
19        THE WITNESS:  Of the drum.
20        MR. PARRISH:  You're describing
21   the kind of steel the drum is made out of.
22        THE WITNESS:  Right.
23        MR. PARRISH:  18 gauge.
24        THE WITNESS:  18 gauge.

1        MR. HARBIN:  Can we take just a
2    second, please?
3        (An off-the-record discussion
4    was held.)
5    BY MR. HARBIN:
6    Q.    I would like to introduce as an
7    exhibit, 1, the response to the Tennessee
8    Department of Environment & Conservation
9    information request by American Drum &
10   Pallet, Inc.  And I'd like to introduce that
11   as Exhibit 1.
12        MR. PARRISH:  This document has
13   a rubber stamp on it.  It says received May
14   23rd, 2007, Memphis field office; is that
15   correct?
16        MR. HARBIN:  Correct.
17        MR. PARRISH:  And that's the
18   field office of what?
19        MR. HARBIN:  Of Tennessee
20   Department of Environment & Conservation.
21        MR. PARRISH:  Okay.
22        (Deposition Exhibit 1 was marked
23   for identification.)
24   BY MR. HARBIN:

1    Q.    Mr. Williams, in this document,
2    Exhibit 1 --
3        MR. PARRISH:  Could you ask him
4    if he can identify it?
5        MR. HARBIN:  Absolutely.
6    BY MR. HARBIN:
7    Q.    Can you identify that document?
8    A.    Yeah, I believe.
9    Q.    Did you submit that or did
10   Mr. Johnnie Williams submit that?
11        MS. RICHARDSON:  He is Johnnie
12   Williams.
13   BY MR. HARBIN:
14   Q.    I mean Michael Williams.  I'm sorry.
15   A.    I'm familiar -- I'm sure I did.
16        MR. PARRISH:  Look through the
17   other pages.
18        THE WITNESS:  Okay.  And I made
19   a mistake.  I think Gray submitted it, Glover
20   Gray.  I believe Glover Gray submitted it.
21   BY MR. HARBIN:
22   Q.    But you are familiar with it?
23   A.    I remember seeing it.  I'm not
24   familiar with it, but I remember. Don't

Exhibit D

74

1  Container, they bought a lot of drum.
2  C-O-W-L-E-Y.  That's in Nashville.  I'm from
3  Nashville.  Yeah, I remember seeing that --
4  not the greatest mind in the world, but I
5  remember seeing it.
6  Q.      But this is a document of American
7  Drum?
8  A.      Uh-huh.
9  Q.      And it was completed by who?
10  A.      Glover Gray.
11  Q.      And I'd also like to introduce as
12  Exhibit 2 the information request from the
13  Tennessee Department of Environment &
14  Conservation dated April 5th, 2007.
15          (Deposition Exhibit 2 was marked
16          for identification.)
17  BY MR. HARBIN:
18  Q.      Now, are you familiar with that
19  document, Mr. Williams?
20  A.      Yes, I'm sure I've seen it.  I'm
21  clearly not the best, but like I say -- yeah.
22  Q.      And I'm not sure if I asked this
23  question or not, but let's go back to the
24  filtration system one last time before we

1  move on to Exhibit 1 and Exhibit 2.
2  A.      Uh-huh.
3  Q.      The material that you collected from
4  the screens that went into the drums --
5  A.      Yes, sir.
6  Q.      -- how were they disposed of?
7  A.      The EPA disposed of them.
8  Q.      Where were they stored?
9  A.      They were stored inside on the
10  concrete floor.
11  Q.      And what were they stored in?
12  A.      55-gallon steel drum, a 17 gauge.
13  That's the heavy one that you put it in.
14  Q.      Now, we're back to talking about the
15  acceptance program.  And in Exhibit 1, it
16  says that drums for pickup or drop-off are
17  inspected for compliance with EPA standards.
18  A.      Uh-huh.
19  Q.      What standards were they inspected
20  for?
21  A.      They inspect to see if they have any
22  kind of residue in them.
23  Q.      So that's what was termed EPA
24  standards?

75

1  A.      I'm sure, yeah.  I guess so, yes,
2  sir.
3  Q.      And who was responsible for
4  conducting that inspection?
5  A.      James Wilkerson.
6  Q.      We've gone over this before.  But did
7  the drums contain any residue materials that
8  were brought to American Drum?
9  A.      It wasn't never brought to my
10  attention.  I didn't check them.  He checked
11  them.  But he knew we're not supposed to put
12  it -- take anything with any residue in them.
13  Q.      Would any have been cleaned that did
14  contain residue?
15  A.      I couldn't say, but it shouldn't have
16  been.  I couldn't say now, but it shouldn't
17  have been.
18          MR. PARRISH:  Did you say
19  shouldn't or should?
20          THE WITNESS:  No, shouldn't have
21  been.  It shouldn't have been.
22  BY MR. HARBIN:
23  Q.      But you weren't there checking to see
24  whether --

76

1  A.      No.
2  Q.      -- or not they contained any residue
3  or not?
4  A.      No, I wasn't.  I was mostly out in
5  the field.
6  Q.      Did Mr. Wilkerson ever perform what
7  was termed a hazardous waste determination on
8  any barrels that contained residue that came
9  into the facility?
10  A.      Well, I know he turned some down; is
11  that what you mean?
12  Q.      There is a term called hazardous
13  waste determination to see if a material is
14  or is not a hazardous waste.  Did you-all
15  ever do that at that facility?
16  A.      No.  Well, you see, you can't
17  determine what a hazardous waste is without
18  any -- if you don't have anything to test it
19  with, you know.  What I'm saying, you got to
20  have the waste in your house, Clorox.  You
21  can't determine that.  You have to go to a
22  lab to determine what's hazardous, what ain't
23  hazardous.  That's how it's determined.
24  Q.      But do you know whether a hazardous

# Exhibit D

78

```
1    waste determination was done by Mr. Wilkerson
2    on any drums that --
3    A.      No, I don't.  No, I don't.
4    Q.      Who owned the drums that were brought
5    to the -- or let me rephrase that.
6            Who owned the drums that were cleaned
7    at the 806 Walnut facility?
8    A.      We owned them till we sold them, the
9    ones that we accept.
10   Q.      When did you-all become the owner?
11   When did American Drum become the owner?
12   A.      Of the drum?
13   Q.      Yes.
14   A.      Whenever we accept them.
15   Q.      And how did the drums come to the
16   facility?
17   A.      By truck, a drum hustler, uh-huh.
18   Q.      And American Drum did not become the
19   owner of them until you-all -- until American
20   Drum accepted them?
21   A.      Accept them.
22   Q.      So when you-all went out and picked
23   them up -- and when I use the term "you-all,"
24   I'm saying American Drum -- when American
```

```
1    Drum went out and picked them up and --
2    American Drum had a person that would go out
3    and pick drums up?
4    A.      Uh-huh.
5    Q.      Is that correct?
6    A.      Yes, sir, that's correct.
7    Q.      Did American Drum own the drums at
8    the time they picked them up?
9    A.      No.
10   Q.      It was only after acceptance?
11   A.      Acceptance.  Because we have to pick
12   up drum and took them back.
13   Q.      Do you know who you took them back
14   to?
15   A.      A glue company over in North Memphis.
16   They closed down since then.  And another --
17   I think I give you the name yesterday.  Last
18   name Omaha.
19   Q.      Say that again, Mr. Williams.
20   A.      Fuller, F-U --
21           THE WITNESS:  How do you spell
22   Fuller?
23           MS. RICHARDSON:  F-U-L-L-E-R,
24   Glue.
```

79

```
1            THE WITNESS:  We took some back
2    to them, and we took back some back to some
3    other company.
4    BY MR. HARBIN:
5    Q.      Can you remember who you took them
6    back to?
7    A.      Not exactly.  I could try come to get
8    it.
9    Q.      If you would do that and you would
10   provide that to Mr. Parrish, we would
11   appreciate that.
12   A.      Yes, sir, I will.
13   Q.      You will try to do that?
14   A.      Yes, sir, I sure will.  Yes, sir.
15   Q.      Can you identify the chemicals that
16   were used by American Drum in its process at
17   the 806 Walnut Street facility?
18   A.      For cleaning drums?
19   Q.      All of the chemicals that was used.
20   A.      In cleaning drum?
21   Q.      Yes, sir.
22   A.      I can find out and let you know.  I
23   don't know.  It was a detergent/soap.  The
24   kind of soap -- a soap, it wasn't supposed to
```

```
1    have any kind of -- just for washing, yeah.
2    So it's kind of like dishwashing soap that go
3    down -- when you wash dishes, go down the
4    drain.
5    Q.      So detergent/soap?
6    A.      Something like detergent/soap,
7    uh-huh.
8    Q.      That was the only chemical that
9    you --
10   A.      The only one I can remember.  We got
11   it from Jack Flint and one other company, got
12   some from Cougar Chemical.  But they knew
13   what kind of soap I needed, what kind I used
14   to wash the drums, yeah.
15   Q.      Did you use any other chemicals?
16   A.      I can't remember.  Except -- I'm
17   sorry.
18   Q.      No, go ahead.
19   A.      Except paint, when we paint the drum
20   with that chemical.
21   Q.      And used gasoline in the rags?
22   A.      On the rags, uh-huh.
23   Q.      So I'm understanding you to say you
24   used three chemicals?
```

Exhibit D

82

1    A.    Uh-huh.

2    Q.    Which would have been the

3    detergent/soap?

4    A.    Uh-huh.

5    Q.    The gasoline?

6    A.    Uh-huh.

7    Q.    And the paint?

8    A.    Paint.  Now, use diesel, too.  The

9    machine was diesel.

10   Q.    And --

11   A.    You call that --

12   Q.    How would you use the diesel?

13   A.    The machine run off diesel.

14   Q.    Diesel gasoline?

15   A.    Yes, sir.  Diesel, not diesel

16   gasoline.  Diesel, what you put in big

17   trucks.  Mr. Steve know what I'm talking

18   about.

19         MR. SPURLIN:  He's talking about

20   fuel for his equipment.

21         MR. HARBIN:  I see.

22         MR. SPURLIN:  None of that is

23   used for cleaning his equipment.

24         MR. PARRISH:  And diesel is not

---

1    gasoline.

2         MR. SPURLIN:  Correct.

3         MR. PARRISH:  That's totally

4    separate.

5    BY MR. HARBIN:

6    Q.    What was the quantity of detergents

7    that you-all used, approximately?

8    A.    If we washing 50 drum, like I said,

9    about a gallon.

10   Q.    And how did you manage the chemical?

11   How was -- who -- who managed -- what

12   employee managed that chemical detergent?

13   A.    (Indecipherable) Williams wanted to

14   wash the drum.  And Charles Wilkerson.

15   Q.    And how about the gasoline?

16   A.    Mostly Charles or somebody, James

17   Wilkerson, whoever wiping the drum down.

18   Q.    And the paint?

19   A.    Charles Wilkerson.  He's the one that

20   did the painting.

21   Q.    How were they stored?

22   A.    We got a storage facility, a little

23   room we put them in.  And we just didn't have

24   that much stored, and we going to paint about

---

83

1    50 drums, two and a half, three gallons --

2    gallon bucket, that's something -- you know,

3    we small, like I say.  We were so small you

4    wouldn't believe it, big facility but small

5    operation.

6    Q.    So I'm understanding you to say,

7    Mr. Williams, that you used -- let me say

8    this one more time to make sure that I'm

9    understanding this correctly -- that you used

10   the chemical detergent?

11   A.    Uh-huh.

12   Q.    The soap/detergent for the cleaning

13   process?

14   A.    Uh-huh.

15   Q.    You used gasoline --

16   A.    Uh-huh.

17   Q.    -- for the drum --

18   A.    For cleaning.

19   Q.    -- preparation, cleaning process?

20   A.    Uh-huh.

21   Q.    And then you used paint?

22   A.    Uh-huh.

23   Q.    And those are the only three

24   chemicals that you used?

---

84

1    A.    That I could -- yes, sir, I can

2    remember that we used.

3         MR. PARRISH:  And diesel.

4         MR. HARBIN:  And diesel.

5         THE WITNESS:  Diesel.

6    BY MR. HARBIN:

7    Q.    Not gasoline, but the fuel to run

8    your equipment?

9    A.    Equipment, yeah.

10   Q.    Did American Drum ever use what's

11   called TCE at its facility?

12   A.    Uh-uh.  What is -- I don't know what

13   TCE is.

14         MR. HARBIN:  Mr. Spurlin, would

15   you identify what TCE is?

16         MR. SPURLIN:  It's generally

17   trichloroethylene.  It's often used as a

18   solvent material.

19         THE WITNESS:  No.

20   BY MR. HARBIN:

21   Q.    Did you ever use trichloroethylene

22   at --

23   A.    I don't remember.

24         MR. SPURLIN:  Mr. Williams, the

**Exhibit D**

86

1  paint that you used for the drums, did you
2  buy -- did you purchase that as a new
3  product, or did you purchase it like as maybe
4  an off-spec or a used paint to paint your
5  drums with, or did you buy it new?
6         THE WITNESS:  We buy it knew
7  from Farrell Calhoun, new, brand-new, bucket.
8         MR. PARRISH:  Did you say the
9  name of the company, Farrell --
10        THE WITNESS:  Farrell Calhoun,
11 paint.
12        MR. PARRISH:  Farrell Calhoun.
13 BY MR. HARBIN:
14 Q.     About how many gallons of paint would
15 you go through with the 50 drums?
16 A.     About two and a half gallon.
17 Q.     And who was the employee responsible
18 for the paint?
19 A.     Charles Wilkerson.
20 Q.     Do you ever remember having
21 trichloroethylene, TCE, on the 806 Walnut
22 facility?
23 A.     I don't remember.  Maybe have.  I
24 don't remember.

1  Q.     You say maybe have.  Explain what you
2  mean by that.
3  A.     Well, what I mean, when Steve and
4  them cleaned it up, it was a lot of chemical
5  there.  I didn't know where -- that's why
6  they came, because I didn't know what it was.
7  It was there when we got the facility.
8  Q.     So the trichloroethylene you're
9  saying would have been there prior to --
10 A.     It may have been there.
11 Q.     May have been there --
12 A.     Yeah.
13 Q.     -- prior to you-all purchasing --
14 A.     Yes, sir.
15 Q.     If it was there, it was there prior
16 to you-all purchasing the facility?
17 A.     Right.
18 Q.     Do you know where that -- who owned
19 that trichloroethylene?
20 A.     No, sir, I don't.  I don't even know
21 who makes it.
22 Q.     Do you know why it was there at your
23 facility?
24 A.     No, I don't.

87

1  Q.     Do you know who brought it to -- why
2  it was left at your facility?
3  A.     No, I don't.
4  Q.     Do you know who left it at your
5  facility?
6  A.     No, sir, I don't know.  Because when
7  we bought it, who owned -- it was -- it was a
8  cabinet company there before we got there,
9  Pioneer Cabinet, and they did a lot of
10 chemicals.
11 Q.     When did you first discover those
12 chemicals there when you moved -- after you
13 moved into the facility?
14 A.     I discovered a lot of drum.  I didn't
15 discover none of it.  They -- I think,
16 Mr. Harbin, and the (indecipherable) guy
17 discovered a lot of it.  Only time we knew
18 they had a lot of drum, like I showed, we had
19 a lot of drum there.  And we never -- in
20 fact, nobody knew what it was because nobody
21 never test it.
22 Q.     When you moved into the facility, did
23 you look around the facility to see if
24 anything was there?

1  A.     A lot -- there was a lot of junk
2  there, a lot of stuff there.
3  Q.     A lot of drums or a lot of things
4  there when you --
5  A.     A lot of drums, a lot of pallets, a
6  lot of debris, a lot of stuff was there.
7  Q.     Where were the drums located in the
8  facility?
9  A.     They was -- they was out in the back,
10 in the back, back there, and then we had out
11 on Alston -- the little -- you know, the shed
12 full of them, the yard was full and the alley
13 back there was full.  So they were
14 everywhere.
15 Q.     And that's the drums that you're
16 saying -- they were there before you-all
17 moved into the facility?
18 A.     I didn't discover them.  They
19 discovered them.
20 Q.     Who is they?
21 A.     EPA discovered them.
22 Q.     But you -- did you ever inspect the
23 facility or walk around the facility prior to
24 EPA discovering the drums?

88

Exhibit D

1   A.   Yes, sir, we did.

2   Q.   Did you ever see those drums that EPA

3  discovered?

4   A.   I seen most of the drums, but I

5  didn't know what was in them. They didn't

6  have no label on them, I don't think. They

7  just, you know --

8   Q.   Did you ever think about inspecting

9  them to see what was in them?

10   A.   No, sir, I didn't.

11   Q.   Did American Drum ever have methyl

12  parathion or use methyl parathion?

13   A.   No, sir, we never used that.

14   Q.   Was it ever on the site?

15   A.   I think Steven showed me in the

16  trailer they were. It went to the people

17  that brung the stuff down from Flying Tiger;

18  and when I seen that had the skull on it,

19  that's when I put them in the trailer. And

20  when Mr. Steven came in, I showed him in the

21  trailer where they were, out on the front

22  dock, because it had a skull on it, I think.

23  I showed him.

24   Q.   Okay. Let's go through this.

---

1   A.   Okay.

2   Q.   There were containers on the American

3  Drum facility that contained methyl

4  parathion?

5   A.   Okay.

6   Q.   Is that correct?

7   A.   Well, I don't know what was -- I know

8  it had a skull on it, and I seen I think on

9  the reports that it had residue in it.

10   Q.   Residue?

11   A.   Uh-huh.

12   Q.   And who brought those containers in?

13   A.   The company dropped them off from

14  Minnow City. I think Flying Tiger.

15   Q.   Do you have records of that?

16   A.   No. I could -- you know, I know

17  where they -- I know where they at. I can

18  get the address. I know where they at. They

19  in Minnow City, Mississippi, down below my

20  hometown.

21   Q.   And would you get that for

22  Mr. Parrish and have Mr. Parrish supply that

23  to me?

24   A.   I sure will, yes, sir.

---

1   Q.   Now, did American Drum go down and

2  pick those containers up, or did the company

3  bring them to --

4   A.   The company brought them to me.

5   Q.   The company brought them to you?

6   A.   Yes, sir.

7   Q.   Were they in a trailer or what were

8  they in? How did the company bring them to

9  you?

10   A.   In a Bob truck.

11   Q.   In a Bob truck?

12   A.   Uh-huh.

13   Q.   And what is a Bob truck?

14   A.   Anything beyond a 24 -- 20 foot, 24,

15  26 Bob truck. It is a Bob truck.

16   Q.   Is it a fully contained covered --

17   A.   Covered, right, uh-huh.

18   Q.   And when did they bring those to you?

19   A.   I have to try to find -- work to find

20  out when. I don't know exactly when.

21   Q.   Take me through the process of --

22  they brought that Bob truck. Was there one

23  Bob truck or two Bob trucks or three Bob

24  trucks?

---

1   A.   Well, I wasn't there. But I think

2  one Bob truck.

3   Q.   One Bob truck?

4   A.   Uh-huh.

5   Q.   And what happened after they came to

6  the facility?

7   A.   After then, they left them on the

8  dock. See, you know, when you -- when you --

9  you was over there yesterday. When people

10  got something they want to get rid of or got

11  something they think -- a used drum like

12  that, they drop them off, hoping that you'll

13  use them, that you need them. They never

14  hardly come back and pick them up.

15   Q.   Say that again.

16   A.   They never hardly come and pick

17  them -- they will drop them off. I

18  remember -- I'm not there while people drop

19  off stuff at.

20   Q.   And so people would drop off drums?

21   A.   Uh-huh.

22   Q.   What did you do with those drums they

23  would drop off?

24   A.   If they dropped off,

**Exhibit D**

94

```
1    drum, we use it.  And if they had anything in
2    them, I made sure that they come back and get
3    them if I knew who dropped them off.
4         Q.      You did know who dropped them off?
5         A.      I know who dropped those off.
6              MR. PARRISH:  I think he said if
7    he knew who dropped them off.
8    BY MR. HARBIN:
9         Q.      And you knew who dropped off the
10   containers that had the residue in them that
11   we're talking about that's in the Bob truck?
12        A.      Right, uh-huh.
13        Q.      After you found out -- after they
14   dropped them off, what happened after that?
15        A.      Then I got my guy to store them in
16   the trailer.
17        Q.      Did you move them from the Bob truck?
18        A.      No.  I moved them from the dock.
19   They dropped them off at the dock.  I moved
20   them from the dock.  After they didn't come
21   back and pick them up after a couple days,
22   because I see the skull on them, I move them,
23   secure them in a trailer and put them behind
24   to make sure nothing would get out.
```

```
1         Q.      Did you call them to tell them to
2    come and pick them back up?
3         A.      Uh-huh, sure did.
4         Q.      And do you remember who you talked
5    to?
6         A.      No.  But I asked Dorothy Williams to
7    go help the guy and she did.
8         Q.      She did?  Dorothy called the --
9    Mrs. Williams called?
10        A.      Uh-huh.
11        Q.      Would Ms. Williams be able to tell
12   me -- to tell us who she talked to?
13        A.      I can ask and see.
14        Q.      Would you find that out for --
15        A.      I find out.
16        Q.      -- for us and get that information to
17   your attorney, Mr. Parrish?
18        A.      Yes, sir.  Uh-huh.
19        Q.      Did you make more than one attempt to
20   call them and --
21        A.      Several attempt.
22        Q.      After you moved them from the loading
23   dock, you -- I'm not understanding,
24   Mr. Williams.  You found them at the loading
```

95

```
1    dock.
2         A.      Uh-huh.
3         Q.      What happened to them after that?
4         A.      I put them in the -- I had my guy put
5    them in the trailer, secure them.
6         Q.      And was the trailer -- again, was the
7    trailer owned by you?
8         A.      Yes, the trailer owned by me.
9         Q.      And the company never came to pick
10   the --
11        A.      No, they didn't.
12        Q.      -- bottles -- the drums back up?
13        A.      No, sir, they didn't.
14        Q.      And where they -- the trailer that
15   you moved them to is the trailer that
16   Mr. Spurlin discovered them in?
17        A.      Uh-huh.  He didn't discover them.  I
18   told him.  When Mr. Spurlin came -- let's put
19   this on record.  When he came there, I took
20   him around -- 100 percent I showed him where
21   everything was and that I didn't know and he
22   had to test and he told me what to do.
23   Everything he told me to do I was doing it.
24        Q.      Okay.
```

96

```
1         A.      Okay.
2              MR. PARRISH:  You're talking
3    about Mr. Spurlin?
4              THE WITNESS:  Mr. Spurlin.
5    BY MR. HARBIN:
6         Q.      During your operations at the 806
7    Walnut Street facility, the cleaning of the
8    drums, the rinsing, the drying, was there any
9    waste generated from the operations?  Did you
10   process waste generated from the operations
11   there?
12        A.      Talking about cleaning the -- what
13   you call it -- the screen off?
14        Q.      Any waste.
15        A.      Yeah.  We put them in the drum,
16   55-gallon drum, 17 gauge.
17        Q.      So we're talking about the waste that
18   was generated from the filtration system; is
19   that what you're speaking of?
20        A.      Uh-huh, right.
21        Q.      And the rags?
22        A.      Uh-huh.
23        Q.      Again, were those the only --
24        A.      Only one that I could remember.
```

Exhibit D

98

```
1   Q.      Tell me one more time.  How did
2   you-all manage the waste that was -- came
3   from the filtration system?
4   A.      We take out of the tank, screen and
5   put into a 55-gallon drum, put tops on it.
6   Q.      And where were they stored?
7   A.      Set them inside the building on
8   concrete, right down from there, wash it.
9   Q.      And the gasoline rags?
10  A.      Yes, sir, put them in a 55-gallon
11  drum.
12  Q.      And they were stored --
13  A.      Inside, too.
14  Q.      Was there ever a hazardous waste
15  determination made on any of those waste --
16  the waste from the filtration system and the
17  rags?
18  A.      We -- no more than what they gave us,
19  you know, EPA with the -- you know.
20  Q.      Was there a Great Dane Trailer on the
21  property?
22  A.      Uh-huh.  Well, it wasn't a Great Dane
23  Trailer.  It was a plain Hoover trailer, I
24  believe, had some Great Dane drums in them.
```

```
1   Q.      Explain that to me, Mr. Williams.
2   A.      Okay.  There was a Hoover -- old
3   Hoover trailer there, had some Great Dane
4   drums in there.  See, Great Dane closed down
5   about, what, 2000 or '99, something like
6   that.
7           So drums -- everybody -- Great Dane
8   did drum paint, they'll paint -- like they
9   make the -- paint the trailer with.  That's
10  what they got, the -- they got paint, you
11  know, whoever got the paint from, they either
12  got it from United Paint, whoever made the
13  paint.  And they had the name on the drum,
14  Great Dane drum.  And it was from them.
15  Q.      Did Great Dane operate at the 806
16  Walnut facility?
17  A.      No.
18  Q.      Where do you think those Great Dane
19  drums came from?
20  A.      Came from Great Dane.
21  Q.      How did they get to the facility?
22  A.      I'm not for sure.  Probably drum
23  hustler.
24  Q.      Were they -- when did they come to
```

99

```
1   the facility?
2   A.      I couldn't tell you.  I don't know.
3   Q.      Were you -- was American Drum
4   operating when the drums came to the
5   facility?
6   A.      No, sir.  They was already there.
7   Q.      And they were in the Hoover trailer?
8   A.      Hoover trailer, uh-huh.
9   Q.      Did you make any attempt to find out
10  who owned the Great Dane drums or who owned
11  the Hoover trailer?
12  A.      No, sir.
13  Q.      Tell me again about Great Dane.  What
14  is Great Dane?
15  A.      Great Dane is a trailer facility.
16  They make trailer, pull behind a tractor, you
17  know, 18-wheeler.  They make trailer, flatbed
18  and boxed-in.
19  Q.      Are they still operating?
20  A.      They closed the Memphis plant but
21  they operating, though.
22  Q.      And they had a Memphis plant?
23  A.      On President Island.
24  Q.      Say that again, please.
```

```
1   A.      On President Island.
2   Q.      When did they close that facility?
3   A.      I think they closed about 2000, right
4   after 2000, 2001, something like that.  But
5   now, they do have another facility, I think,
6   on Mallory Street.  I'm not for sure.  But I
7   don't think they do no paint --
8           (Reporter interrupted.)
9   A.      Mallory.
10          MR. PARRISH:  M-A-L-L-O-R-Y.
11          THE WITNESS:  And I said I don't
12  think they do no paint there.  I think they
13  just make trailer.  I'm not for sure.
14  BY MR. HARBIN:
15  Q.      But the drums were marked Great Dane?
16  A.      Yes, sir.
17  Q.      About how many drums were there?
18  A.      I don't know.  You may have to ask
19  Mr. Steven.  Quite -- may have been quite a
20  few, but I don't...
21  Q.      Was Pioneer Cabinet -- you've
22  mentioned Pioneer Cabinet operating there
23  before American Drum.
24  A.      Uh-huh.
```

Exhibit D

1    Q.    Was Pioneer Cabinet responsible for
2    any materials or waste that was left on the
3    site?
4    A.    I don't know.
5         MR. PARRISH:  When you're asking
6    responsible, that's sort of a legal question.
7    If you could maybe rephrase it.
8    BY MR. HARBIN:
9    Q.    To your understanding -- do you know
10   whether Pioneer Cabinet Company left any
11   materials or waste on the site?
12   A.    I don't know.  They made cabinets for
13   Holiday Inn.  I know that.  And when you make
14   cabinets, you got paint, you got lacquer, and
15   you got all kinds of stuff.
16        MR. HARBIN:  Can we take a
17   break?
18        (A recess taken.)
19   BY MR. HARBIN:
20   Q.    Mr. Williams, could you identify the
21   customers of American Drum, when it was both
22   American Drum & Pallet Company, Inc. and
23   American Drum & Pallet, Inc.?
24   A.    The same, I think, same customers.

1    Q.    Okay.  And the -- I'm not looking --
2    we're not looking for the ones that you sold
3    clean drums to.
4    A.    Uh-huh.
5    Q.    We're looking for the customers who
6    supplied you drums --
7    A.    Uh-huh.
8    Q.    -- who you would pick up drums from
9    or who supplied you drums.  Who were those
10   people or companies?
11   A.    Told you all that, yeah.  The ones I
12   told you.  Now, I may have a few, I gave
13   Ms. Brenita one yesterday.  I may have a
14   couple -- as I go through my work, when I
15   find something, I always try to call my
16   attorney and let him know that I come up with
17   something new.
18   Q.    Well, you gave me a sheet of paper
19   yesterday that I didn't ask for, but you
20   provided this to me --
21   A.    I provided that it you.
22   Q.    -- yesterday.  And I would like to
23   introduce this as Exhibit 3.
24        MR. HARBIN:  Do you have any

1    objection?
2         MR. PARRISH:  No.
3         THE WITNESS:  I gave it to him.
4    Now, I may have some to add on, I told her.
5    BY MR. HARBIN:
6    Q.    And I want to be clear, Mr. Williams.
7    You gave this to me and to Ms. Richardson
8    yesterday.  We did not ask for this.  You
9    gave this to us voluntarily yesterday --
10   A.    Sure did.
11   Q.    -- without us asking for this?
12   A.    Sure did.
13        MS. RICHARDSON:  I want to get
14   on the record the company you mentioned
15   yesterday.  Was that the Marianna Company?
16        THE WITNESS:  Yeah.  Marianna.
17        MS. RICHARDSON:  Of Omaha,
18   Nebraska?
19        THE WITNESS:  Yeah, that --
20   Omaha.  They closed the Memphis plant.  They
21   had a big plant in Memphis, and I got a
22   couple more.  But I just can't think in my
23   mind.  One of them, I know -- Bunia, I
24   believe.  Bon -- I have to go out and see,

1    you know --
2    BY MR. HARBIN:
3    Q.    Would you think about that and
4    provide that to Mr. Parrish as well?
5    A.    Yes.
6         (Deposition Exhibit 3 was marked
7    for identification.)
8    BY MR. HARBIN:
9    Q.    Mr. Williams, you've identified that
10   as the paper you gave to me --
11   A.    Yesterday.
12   Q.    -- yesterday.
13   A.    Uh-huh.
14   Q.    And I'm going to going through these
15   one at a time.
16   A.    Okay, sir.
17   Q.    If that's okay.
18   A.    Yes, sir.
19   Q.    Rich Foods?
20   A.    Uh-huh.
21   Q.    What do they supply to you?
22   A.    Plastic and steel drum and tote tank.
23   Q.    And what were they -- what was the
24   nature of their business?

Exhibit D

1      A.    I think ice cream.  I'm not for sure,
2  but they made food.
3      Q.    Was there a written contract?
4      A.    No, sir, no.
5      Q.    And the -- about how many containers,
6  would they -- did they supply containers to
7  you?
8      A.    I guess in a month's time I'd say
9  about 75 to 100.
10     Q.    Was that through each and every
11 year --
12     A.    Yes, sir, uh-huh.
13     Q.    -- that you were operating --
14     A.    Uh-huh.
15     Q.    -- there?
16     A.    Uh-huh.
17     Q.    That's how many containers they would
18 supply?
19     A.    Uh-huh.
20     Q.    What would they supply again?
21     A.    Plastic, steel and tote tank.
22     Q.    Was there material in those drums?
23     A.    No.  They were clean.
24     Q.    They were clean.  How were they

1  delivered to the facility?
2      A.    We picked them up.
3      Q.    And again who owned the drums?  Did
4  you -- who owned those drums?  Did you own
5  them when you picked them up, did you own
6  them when you got them to the facility?  Who
7  owned those drums?
8      A.    When we got them to the facility, we
9  would use all of them.
10     Q.    Is there a contact person for Rich
11 Foods?
12     A.    I could get the name.
13     Q.    Smucker's Jelly?
14     A.    Uh-huh.
15     Q.    And did they provide the drums or did
16 you go and pick them up?
17     A.    Went out and picked them up.
18     Q.    Was there a written contract?
19     A.    No.
20     Q.    Was there a written contract with any
21 of these companies?
22     A.    No, uh-uh, no.
23     Q.    And again with any of these
24 companies, do you ever remember there being

1  any material in the drums that you would pick
2  up?
3      A.    Could I look at that?
4      Q.    Yes.
5      MR. PARRISH:  That is Exhibit 3
6  that you're looking at?
7      THE WITNESS:  Uh-huh.
8      MR. HARBIN:  Thank you.
9      THE WITNESS:  Only company that
10 I remember that we picked up drum that may
11 have some residue in it was CCL because they
12 made cologne, CCL, they made cologne and face
13 stuff like that.  I also they -- the Flying
14 Tiger in Minnow City there, yeah, they had
15 them in.
16 BY MR. HARBIN:
17     Q.    It says Target Flying.  Did you mean
18 that --
19     A.    I mean Tiger, should be Tiger Flying.
20 I'm sorry.
21     Q.    So out of these, and I'm going to
22 read these off --
23     A.    Yeah.
24     Q.    -- there was Rich Foods?

1      A.    Uh-huh.
2      Q.    Smucker Jelly?
3      A.    Uh-huh.
4      Q.    Newlywed Foods?
5      A.    Now, Newlywed may have -- I'm not for
6  sure because we took -- we had some drum that
7  had some hot sauce and some molasses in them
8  and we took them back, but they clean them
9  out.  We took the drum back.
10     Q.    And they came and got them?
11     A.    No.  We took them back.
12     Q.    You took them back?
13     A.    Yeah, they cleaned them out and we
14 got them.
15     Q.    They cleaned them out?
16     A.    Yes.
17     Q.    Newlywed Foods cleaned them out?
18     A.    Yes.
19     Q.    And they brought them back to the
20 facility?
21     A.    No.  We picked them up.
22     Q.    You picked them up?
23     A.    Uh-huh.
24     Q.    Pepsi Cola Bottling?

Exhibit D

1    A.    We got a lot of -- most of them had
2    was Pepsi Cola syrup.
3    Q.    You would clean the syrup out?
4    A.    Only be just a little, yeah, because
5    Pepsi Cola had so many, they had quite a few.
6    And you see in the pictures Pepsi Cola drum.
7    Q.    How many?
8    A.    We used to pick Pepsi Cola every two
9    weeks.  Yeah, Pepsi Cola drums.
10         MR. HARBIN:  I'd like to make
11   this photograph Exhibit 4.
12         (Deposition Exhibit 4 was marked
13   for identification.)
14   BY MR. HARBIN:
15   Q.    Mr. Williams, you've identified this
16   photograph Exhibit 4 as the Pepsi Cola?
17   A.    Pepsi Cola.
18   Q.    And it had -- the Pepsi Cola had
19   syrup residue in some of them?
20   A.    Yes, sir.
21   Q.    Leonard's Recycling, what was that?
22   A.    That was plastic drums that we got
23   from him.
24   Q.    Do you know what their business was,

1    Leonard's Recycling?
2    A.    No.  I think he was picking them up
3    from somewhere else.  I'm not for sure.  I
4    think he was picking them up from Ideal
5    Chemicals, but they were empty when he
6    brought them.
7    Q.    Did they contain any residue?
8    A.    I couldn't say.
9    Q.    Who would know that?
10   A.    James Wilkerson, James Wilkerson
11   would know.  I can ask him and get a
12   statement from him through my lawyer.
13   Q.    If you could do that, I would
14   appreciate that.
15   A.    Yes, sir.  And you make a note of
16   what I need to do.
17   Q.    We're doing that.
18   A.    Okay.  I'm sorry.  Because I will
19   forget.
20   Q.    We're doing that, Mr. Williams, but
21   thank you.
22         Precision Technology, did you pick up
23   barrels for them?
24   A.    Yeah, I picked up drums from them,

1    yes, sir.
2    Q.    You picked up drums from them.  Did
3    they have any residue?
4    A.    No.
5    Q.    What was Precision Technology, what
6    was their business?
7    A.    They were making something like hair
8    spray.
9    Q.    What kind of drums did you pick up
10   from them?
11   A.    Steel and plastic.
12   Q.    Hanco Manufacturing?
13   A.    Uh-huh.
14   Q.    Did you pick up --
15   A.    Picked up steel from them.
16   Q.    Steel drums from them?
17   A.    Uh-huh.
18   Q.    Did they contain any residue?
19   A.    No.  No.
20   Q.    What was their business,
21   Mr. Williams?
22   A.    I don't know.  I have to find out.
23   Q.    I forgot if I asked this, but what
24   drums did you pick up from Hanco?

1    A.    Steel.
2    Q.    Steel drums?
3    A.    Uh-huh.
4    Q.    Jack Flint & Son, what did you pick
5    up from them?
6    A.    Steel and plastic and tote tank.
7    Q.    Did they contain any residue, to your
8    knowledge?
9    A.    No, not to my knowledge -- they made
10   soap or we bought soap from them.
11   Q.    I see.  Jackson Oil Company.
12   A.    Uh-huh, picked up empty drums from
13   them.  They handle oil.  They used to be in
14   Memphis, but they in West Memphis now.
15   Q.    What drums did you pick up from them?
16   A.    Steel and tote tank, they didn't have
17   plastic.  Steel and tote tank.
18   Q.    Kenny & Associates?
19   A.    He made this air condition oil that
20   he sold to Carrier, Carrier Air Conditioning.
21   He's on Jackson.  The drums I pick up from
22   him was empty.
23   Q.    What kind of drums did you pick up?
24   A.    Open head.

Exhibit D

114

```
1    Q.    Open head?
2    A.    Uh-huh, steel.
3    Q.    Steel, open-head steel?
4    A.    Open-head steel, yes, sir.
5    Q.    Chemical Specialty?
6    A.    Uh-huh.
7    Q.    Did you pick up drums from them?
8    A.    All kinds, plastic, steel, uh-huh.
9    Q.    Did they contain any residue?
10   A.    Not -- no, no, not that I know of, I
11   don't think they did.
12   Q.    We've got CCL?
13   A.    Now they did contain residue because
14   they had mostly fumes and -- perfume and
15   lotion, they made lotion, perfume, you know,
16   deodorant.
17   Q.    And I think you indicated that there
18   were some barrels that had residue from CCL?
19   A.    From CCL, yes, sir.
20   Q.    And help me here because I forget
21   whether I've asked you this:  What did you
22   get from CCL?
23   A.    All kinds, steel, plastic, tote tank.
24   Q.    And about how many would you get from
```

```
1    CCL?
2    A.    I would say about close to 100 a
3    month.
4    Q.    Was that during all of the operations
5    through the years that you operated --
6    A.    Uh-huh.
7    Q.    -- at the facility?
8    A.    Yes, sir.
9    Q.    Farris Calhoun Paints?
10   A.    Uh-huh.
11   Q.    Did you get drums from them?
12   A.    And tote tanks.
13   Q.    And the quantity of drums that you
14   would get from them?
15   A.    Very few, I guess about 50 every two
16   or three months; we got quite a few tote
17   tank, I'd say 35 tote tank a month.
18   Q.    And was that during the whole time
19   that you operated there?
20   A.    Mostly.  Mostly.
21   Q.    And what do you mean by mostly?  Help
22   me out.
23   A.    Well, a lot of time the company like
24   Cowley Container, Tennessee and Memphis,
```

115

```
1    whoever come first, first-come, first-serve,
2    get the drum.
3         MR. PARRISH:  Did you say Kelly?
4         THE WITNESS:  Cowley, they
5    own --
6         MR. SPURLIN:  C-O-W-L-E-Y.
7         THE WITNESS:  Yeah, Cowley, they
8    in Nashville.
9    BY MR. HARBIN:
10   Q.    Did you get containers from Cowley
11   Containers?
12   A.    No.  I sold them containers.
13   Q.    Tri-State Agricultural, did you get
14   containers from --
15   A.    That is the little white 30 gallon.
16   No, I have to find out.  They from over in
17   Arkansas somewhere.
18   Q.    Yes, sir.  They are listed as being
19   in Arkansas.
20   A.    I have to find out.  We got 30-gallon
21   drums from them.
22   Q.    That was steel and plastic drums?
23   A.    No.  Just plastic.
24   Q.    Just plastic.  Did they contain any
```

```
1    residue?
2    A.    No.
3    Q.    And airport is listed here in
4    Clarksdale, Mississippi; is that --
5    A.    That's Sweeney Airport, I think
6    W.N.N. Sweeney, right on 49 right outside
7    Clarksdale.
8         MR. PARRISH:  Are you saying
9    S-W-I-N-N-E-Y (sic)?
10        THE WITNESS:  I believe so,
11   Sweeney.
12   BY MR. HARBIN:
13   Q.    What did you get from Sweeney
14   Airport?
15   A.    Plastic drums, 55-gallon drum and
16   30-gallon.
17        MR. SPURLIN:  Was Sweeney a crop
18   dusting-related facility?
19        THE WITNESS:  Yes.
20        MR. SPURLIN:  Thank you.
21   BY MR. HARBIN:
22   Q.    You have got right below airport, you
23   have Sweeney Flying.
24   A.    That's it, Flying.  The other
```

116

Exhibit D

'118

1   airport's in Clarksdale, two different ones,
2   two different ones.
3   Q.      I'm sorry.  Help me clarify it.  We
4   have airport listed in Clarksdale,
5   Mississippi and Sweeney Flying in Clarksdale,
6   Mississippi?
7   A.      Sweeney Flying on 49.  Airport is on
8   61 before you get in Clarksdale.
9   Q.      Let's go back up to airport.
10  A.      Okay.
11  Q.      What do you mean by airport?
12  A.      Well, they handle a lot of drums too.
13  They have crop dusters like Sweeney do.  So I
14  get 30 gallon from them and get 30 gallon and
15  55 from Sweeney.
16  Q.      And is this the name of the company,
17  just airport?
18  A.      No.  I have to get that.  I'll give
19  it to the attorney.  I'll get the name of it.
20  We call it airport because they shorter name.
21  We know about it, you know.
22  Q.      But it was a crop dusting facility?
23  A.      Yes, sir.  Yes, sir.
24  Q.      And it was on Highway --

1   A.      61.  Right over by the -- the Army
2   Reserve thing; airport, Army Reserve all
3   together.
4   Q.      You would pick up drums?
5   A.      30 gallon.
6   Q.      30 gallon?
7   A.      Yes, sir.
8   Q.      Any 55 gallon?
9   A.      No, not from them.  Mostly 30 gallon.
10  Q.      And how many would they supply to
11  you-all?
12  A.      I guess I would say about 100 every
13  two or three months.
14  Q.      During the whole time --
15  A.      Whole time, yes.
16  Q.      American Drum operated?
17  A.      Yes, sir.
18  Q.      And Sweeney Flying?
19  A.      Uh-huh.
20  Q.      That's the one that we just talked
21  about?
22  A.      Talked about.
23  Q.      And, again, about how many did they
24  supply?

119

1   A.      Sweeney, I would say something like
2   about 75 every 90 days or something like
3   that.  Now, I got 55 and 30 from Sweeney,
4   combined 75.
5   Q.      And that was the whole time that
6   American Drum operated at the 806 facility?
7   A.      Right, yes, sir.
8   Q.      And then we've got Target Flying, but
9   that was supposed to be Tiger?
10  A.      Tiger.
11  Q.      Or Flying Tiger?
12  A.      Flying Tiger, that's it, in Minnow
13  City, Mississippi.
14  Q.      And that is a crop dusting --
15  A.      Uh-huh, yes, sir.
16  Q.      About how many drums did you get from
17  Flying Tiger?
18  A.      I don't know how many, but that's the
19  one that has the skull on it; and we -- yeah.
20  I guess we had about 50, 60.  How many was
21  there?
22          MR. SPURLIN:  There's a final
23  count on the one we dealt with in the report.
24  I don't remember the number off the top of my

120

1   head.
2   BY MR. HARBIN:
3   Q.      About how many -- did you -- did
4   Flying Tiger supply drums to you-all, to
5   American Drum, the whole time you were in
6   operation there?
7   A.      Not the whole time, but sometimes.
8   Q.      More than one occasion?
9   A.      More than one occasion.
10  Q.      About how often?
11  A.      I would say about once a year out of
12  about four year.  See, they drum -- the other
13  drum we got from them, the 30 gallon, 55, but
14  these last ones that they brought and dropped
15  on the dock was the one that had the skull on
16  it.  The one I didn't use -- didn't take from
17  them.
18          MS. RICHARDSON:  Let me ask a
19  question about Tiger Flying or Flying Tiger.
20  Is it Flying Tiger of Mississippi or is it --
21  do you have a different name or a specific
22  name?
23          THE WITNESS:  No.  I could get
24  it for you.  I'll get it for you.

Exhibit D

122

```
1        MS. RICHARDSON:  Okay.  Then it
2   is a Mississippi --
3        THE WITNESS:  Yes, Minnow City,
4   Mississippi.
5   BY MR. HARBIN:
6   Q.    Parker Hannisan?
7   A.    Uh-huh.  Arkansas.
8   Q.    What is the -- Truman, Arkansas?
9   A.    Okay.  Uh-huh.
10  Q.    Tell me what drums you got from them.
11  A.    Steel, open head and closed head.
12  Q.    And you would pick them up?
13  A.    I would pick them up.
14  Q.    How many would you get?
15  A.    About one load every four or five
16  months and a load consisted of about 75 to
17  100 drums.
18  Q.    And that was the whole time that
19  American Drum operated?
20  A.    Mostly.  Not whole time.  I would say
21  two or three a year the time that we were
22  there.
23  Q.    Lincoln, Incorporated in Jonesboro,
24  Arkansas.
```

```
1   A.    Picked up there one time.
2   Q.    And what did you pick up?
3   A.    Steel drum.
4   Q.    Did it have any residue in it?
5   A.    No.  They cleaned and washed them
6   out.
7   Q.    Yellow Freight in Memphis, Tennessee.
8   A.    Yes, sir.
9   Q.    And what did they supply to you?
10  A.    We picked up all the empty drums, all
11  the drums; soap drum, oil drum.
12  Q.    What size drums?
13  A.    55 gallon.
14  Q.    55 gallon?
15  A.    Uh-huh.
16  Q.    And how often --
17  A.    We got Yellow about once, I would
18  say, about once every four or five months.
19  Q.    How many drums would they supply?
20  A.    About 30 or 40.
21  Q.    Once every three or four months?
22  A.    Yes, sir.
23  Q.    Was that the whole time that American
24  Drum operated at the facility?
```

123

```
1   A.    About four year.
2   Q.    Did it have any residues that you
3   remember?
4   A.    No.  Well, they didn't wash them out.
5   They have had some with oil residue and soap
6   residue.
7   Q.    Phoenix Zinc, Incorporated?
8   A.    Uh-huh.  They -- they out of
9   business.  They in Collierville --
10  Millington.  You-all spent about 5 or 6
11  million dollars to clean that place up on
12  Church Road out in Millington.  We picked up
13  a lot of tanks from them from about 2'04 to
14  about 2'06, but they clean up that place.
15  Q.    Did they supply drums?
16  A.    Yes, sir.
17  Q.    How many would they supply?
18  A.    I would say about 40, 50 every 90
19  days to six months.
20  Q.    And was there any residue that --
21  they cleaned theirs out?
22  A.    They cleaned theirs out.
23  Q.    Gromoor Company?
24  A.    Yeah, on the island.  We picked up
```

```
1   plastic from them and they cleaned theirs
2   out.  They are part of -- Gromoor part of
3   Drexel Chemical.
4   Q.    And how many would you pick up?
5   A.    They was open about two year.  We
6   pick up -- in the whole total in the two year
7   we picked up over 150 drums.
8   Q.    Were they 55?
9   A.    55, plastic.
10  Q.    And did they wash theirs out?
11  A.    Yes, sir, they washed out.
12  Q.    Piper Impack?
13  A.    I believe they in Batesville,
14  somewhere in Batesville, Mississippi, I
15  believe.
16  Q.    Yes, sir.
17  A.    We picked up a lot from them.  Steel
18  drums, open head and tight head.
19  Q.    And how many would you get from them?
20  A.    I would say about a load, about 100
21  every 90 days.
22  Q.    Was that during the whole time that
23  American Drum operated?
24  A.    Not the whole
```

Exhibit D

1    three or four years.

2    Q.    Was that in the later part of the

3    three or four years or the earlier part?

4    A.    Early part.

5    Q.    Early part?

6    A.    Yes, sir.

7              MR. SPURLIN:  Do you know the

8    nature of their business?

9              THE WITNESS:  No, I don't.  I

10   think they made air conditioning.  I'm not

11   for sure.  You know they are not CCL anymore.

12   They change their name to KIK, K-I-K,

13   something like that.

14   BY MR. HARBIN:

15   Q.    K-I-K?

16   A.    Uh-huh.

17   Q.    Do you know where they are located?

18   A.    On Third Street, 19 -- 1800 block of

19   Third Street and 61.

20             MR. PARRISH:  Third and 61 are

21   the same street.

22             THE WITNESS:  Yeah, the same

23   street.

24             MS. RICHARDSON:  I notice you do

---

1    a lot of business with crop dusters and you

2    said Flying Tiger is the one that left the

3    drums with the skulls on it?

4              THE WITNESS:  Uh-huh.

5              MS. RICHARDSON:  Do you have

6    some documentation that they're the ones that

7    left the drums or how do you know they left

8    the drums?

9              THE WITNESS:  I called them --

10   Dorothy Williams called them and they said

11   they would pick them up, but they never did.

12   BY MR. HARBIN:

13   Q.    Was Monsanto ever a client?  Did they

14   ever supply drums to American Drum & Pallet

15   Company?

16   A.    No, sir.

17   Q.    During the lien meeting, the name

18   Monsanto was mentioned.  How was that

19   mentioned, do you remember in what context?

20   You said you had a contract with Monsanto.

21   A.    That was the other company I told

22   you, W.R. Drum, a while back, over 10 years

23   ago.

24   Q.    And that was W.R. Drum?

---

1    A.    Uh-huh.

2    Q.    W.R. Drum ever operated at 806

3    Walnut?

4    A.    No, sir.

5    Q.    So Monsanto did not supply any drums

6    and never was a client to American Drum &

7    Pallet Company?

8    A.    No, sir.

9    Q.    Did American Drum do business with

10   Dupont?

11   A.    Not at American Drum & Pallet, no,

12   sir.

13   Q.    It again was mentioned during the

14   lien meeting that we had.  In what context

15   was Dupont mentioned?

16   A.    In the old company.

17   Q.    That was W.R. Drum?

18   A.    Right, uh-huh.

19   Q.    So Dupont -- did Dupont ever supply

20   any drums or conduct any business with

21   American Drum at the 806 Walnut facility?

22   A.    No, sir.

23   Q.    Did American Drum conduct any

24   business with Asplundh?

---

1    A.    I don't remember that name.

2              MS. RICHARDSON:  It's Tree

3    Expert, Asplundh Tree Expert Company.

4              THE WITNESS:  I don't remember

5    that.  What the address?  Do you have an

6    address?

7              MS. RICHARDSON:  I don't have an

8    address.  I believe you told Mr. Spurlin that

9    Asplundh Tree Expert Company used the

10   herbicide to maintain railroad right-of-way.

11   You don't remember that?

12             THE WITNESS:  No, I don't.

13             MS. RICHARDSON:  Okay.

14             MR. PARRISH:  Is that S-P-I-N --

15             MR. HARBIN:  That is

16   A-S-P-L-U-N-D-H.

17             MR. PARRISH:  Okay.

18   BY MR. HARBIN:

19   Q.    But you, Mr. Williams, don't remember --

20   A.    I don't remember that.

21   Q.    -- using any -- getting any drums

22   from Asplundh?

23   A.    I don't even know the company.  If I

24   could find out, I will let you know.  I'm

**Exhibit D**

130

1   trying to think now.

2   Q.     There were 144 containers that you

3   had indicated came from Asplundh. Do you

4   remember that?

5   A.     I don't -- let me go back and think

6   and look. I will do it and I will definitely

7   let you know. Asplundh.

8         MR. PARRISH: Big green trucks,

9   they are all over town. During the ice storm

10   they were taking --

11         MR. HARBIN: We want to take a

12   break for a second. We three are going to

13   caucus outside.

14         MR. PARRISH: We'll go out.

15         (A recess was taken.)

16   BY MR. HARBIN:

17   Q.     Mr. Williams, Chemical Specialty is

18   listed here in Memphis, Tennessee, is that a

19   paint-related company? Do you know what its

20   business is?

21   A.     No. Made chemical, it make soap,

22   make chemical that you drain chemical, all

23   that.

24   Q.     Is Kraft Foods Nabisco --

---

1   A.     Uh-huh.

2   Q.     Did American Drum pick up containers

3   for Kraft Foods?

4   A.     Sure did. I forgot to put them in

5   there.

6   Q.     How many containers --

7         MR. PARRISH: So we're clear,

8   you forget to put them on Exhibit 3?

9         THE WITNESS: Uh-huh.

10         MR. PARRISH: Okay.

11         MR. HARBIN: Thank you for the

12   clarification.

13         MR. PARRISH: Sorry.

14         MR. HARBIN: Absolutely.

15   BY MR. HARBIN:

16   Q.     About how many containers did you

17   pick up for Kraft Foods?

18   A.     I'll say something like about 10 or

19   15 a month, very few.

20   Q.     Was that during the whole time that

21   American Drum operated?

22   A.     Uh-huh, yes.

23   Q.     What kind of drums did you pick up?

24   A.     Open head and tight head.

---

131

1   Q.     They were 55 gallon?

2   A.     Yes, sir.

3   Q.     Were they rinsed out?

4   A.     Uh-huh, yeah.

5   Q.     Did they contain any residue?

6   A.     No residue.

7   Q.     And Hershey Chocolate, U.S.A.?

8   A.     Uh-huh.

9   Q.     That was a --

10   A.     Hershey, they make candy.

11   Q.     Yes, sir.

12   A.     And they make -- we picked up very

13   few from them.

14   Q.     When you say very few, how many?

15   A.     I would say 35 every two or three

16   months.

17   Q.     During the whole time that American

18   Drum operated?

19   A.     Yeah, about four year, you know, say

20   about four year.

21   Q.     The first four years?

22   A.     First four years.

23         MR. PARRISH: Are they on

24   Exhibit 3?

---

132

1         THE WITNESS: No.

2         MR. PARRISH: But should be?

3         THE WITNESS: Should be, yeah.

4   BY MR. HARBIN:

5   Q.     Did the containers from Hershey

6   Chocolate contain any residue?

7   A.     No, sir.

8   Q.     Did you pick up any drums from

9   American Fireworks?

10   A.     No. We sell them drums.

11   Q.     Dee's Oil Company, did you pick up

12   any containers from Dee's Oil Company?

13   A.     Yes, sir.

14   Q.     What did you pick up from Dee's Oil

15   Company?

16   A.     Steel drum.

17   Q.     And how many did you pick up from

18   Dee's Oil Company?

19   A.     We were selling Dee. We pick up 100

20   and sell them 100.

21         MR. PARRISH: Could you spell

22   Dee's?

23         THE WITNESS: D-E-S, I believe.

24         MR. HARBIN:

**Exhibit D**

```
 1                THE WITNESS:  Uh-huh.
 2                MR. PARRISH:  Are they on
 3   Exhibit 3?
 4                THE WITNESS:  No, they are not.
 5                MR. PARRISH:  Should they be?
 6                THE WITNESS:  They should be.
 7   BY MR. HARBIN:
 8        Q.      Drexel Chemical Company, did you pick
 9   up any drums from Drexel Chemical Company?
10        A.      No, sir.  Only sold them drums.
11        Q.      Farrell Ocolor, O-C-O-L-O-R?
12        A.      Oh, we sold them drums, F-E-R-C-O,
13   whatever.
14        Q.      Say that again.
15        A.      F-E-R-C-O, Ferco or something like
16   that.  We sold them drums.
17        Q.      You didn't pick up any drums from
18   them?
19        A.      No.
20        Q.      Hancock Equipment & Oil Company?
21        A.      No.  We sell them drums.
22        Q.      Sell them drums?
23        A.      Uh-huh.
24        Q.      You did not pick up any drums from
```

```
 1   them?
 2        A.      No.
 3        Q.      And Chandler Demolition Company?
 4        A.      We sell them drums.  They put --
 5        Q.      Did you pick up any drums from them?
 6        A.      No.  Demolition company.  We didn't
 7   pick up any.
 8        Q.      Did you pick up any drums from
 9   Progressive Adhesives?
10        A.      No.  We sell them drums.
11        Q.      Delta Foremost Company?
12        A.      We sell them drums.  Don't pick up
13   any.
14        Q.      Did you pick up any drums from
15   Chemex?
16        A.      No.  We sell them drums.
17        Q.      Did you pick up drums from Ricsan
18   Products?
19        A.      No, we sell them drums.
20        Q.      Did you pick up any drums from
21   MidSouth Adhesives?
22        A.      No.  We sell them drums.
23        Q.      Did you pick up any drums from Moore
24   Agricultural Products?
```

```
 1        A.      No.  We sell them drums.
 2        Q.      Did you pick up any drums from
 3   Evergreen Recycles?
 4        A.      No.  We sell them plastic.  That's
 5   the guy in Jackson, Evergreen Recycle on
 6   Mobile Street, I believe.  We sell them all
 7   the -- that's who I've been trying to get the
 8   name.  We sell them all of our scraps and he
 9   grinds them up.  I couldn't get the name.
10        Q.      Very good.  Did you sell any drums --
11   did you pick up any drums from Specialty
12   Adhesives?
13        A.      No.
14        Q.      Did you pick up any drums from Keen
15   Expedition?
16        A.      No.  We sell them drums.
17        Q.      Did you pick up any drums from Dennis
18   Knoll?
19        A.      No.  We sell them drums.
20        Q.      Did American Drum & Pallet Company,
21   Inc. have insurance -- any type of insurance
22   at the facility to cover the facility?
23        A.      At one time we did.  We don't have it
24   now, we didn't have --
```

```
 1        Q.      Who was the insurance company?
 2        A.      I believe it was Shelter Insurance.
 3   Have to find out who.
 4                MR. PARRISH:  Shelter?
 5                THE WITNESS:  Shelter Insurance.
 6   BY MR. HARBIN:
 7        Q.      Shelter?
 8        A.      Uh-huh, yes.  I have to find out for
 9   sure.
10        Q.      What kind of insurance did it -- did
11   you have there?
12        A.      We had comprehensive and liability,
13   both kinds.  Do you have any records of the
14   insurance policy?
15        A.      I think I can find it, yes, I think I
16   can find it.
17        Q.      We would like you to do that --
18        A.      Okay.
19        Q.      -- Mr. Williams.
20        A.      Okay.
21        Q.      So you can only remember one
22   insurance company?
23        A.      Uh-huh.
```

Exhibit D

1   Q.      That -- is that correct?
2   A.      Shelter, yes, sir.
3   Q.      What's the current operational status
4   of the 806 Walnut Street facility now?
5   A.      It's scrapping stuff because the FBI
6   went to all our customers.  They won't buy
7   anything from us.  We sell scrap, sell a drum
8   here, selling pallet, whatever we sell to
9   make a dollar to keep the lights on.
10  Q.      Is it still American Drum?
11  A.      Yes, sir.
12  Q.      It's still American Drum & Pallet?
13  A.      Yes, sir.  We lost all of our
14  customers.
15  Q.      Is there any hazardous waste that's
16  currently being generated there?
17  A.      No, sir.
18  Q.      Are there any hazardous waste
19  currently located on the facility?
20  A.      Not as I know, there's not.
21  Q.      Has hazardous waste been located on
22  the facility within the last 60 days?
23  A.      Not as I know.  Not as I know.
24  Q.      Could there have been and you not

1   know about it?
2   A.      Could have been and I didn't know
3   about it, but I don't remember none being on
4   there.
5   Q.      Are you aware of any hazardous waste
6   being on the facility within the last 60 days
7   in any way?
8   A.      No, sir.  I'm not aware.
9   Q.      Have you talked to your employees or
10  anyone about hazardous waste being on the
11  facility within the last 60 days?
12  A.      No, sir, I haven't.
13  Q.      Why are the fiber board containers at
14  the facility presently at this facility?
15  A.      At that time -- they all empty.
16  That's what we -- them came from Newlywed
17  Foods.  They all empty, so we clean them up
18  and we got -- we cleaned at the facility and
19  put the fiber board up under the shed with
20  lumber and tin and stuff.  The Code
21  Enforcement, they told us to get them and
22  stack the wood on -- off the ground and stack
23  the drum up in there.
24  Q.      Explain that again.  The Code

1   Enforcement did what, Mr. Williams?
2   A.      Ask me to stack those drums up neat
3   out at the facility and stack them along with
4   the lumber and the buckets and whatever we
5   stacked up underneath the tins and stuff.
6   Q.      The lumber?
7   A.      Yes.  We got lumber up under there,
8   too, and tin.
9   Q.      Are they new fiber board containers?
10  A.      No.
11  Q.      They are used?
12  A.      They are used.
13  Q.      And they are clean?
14  A.      They're clean.
15  Q.      What are you going to use them for
16  now?
17  A.      I don't know.  I don't know.
18  Q.      And do they belong to American Drum?
19  A.      Yes, sir.
20  Q.      And you said earlier; who brought
21  them to the facility?
22  A.      We picked them up from Newlywed Food.
23          MR. HARBIN:  Could you give me
24  just a second?

1              (Pause in proceedings.)
2          MR. PARRISH:  While you're doing
3   that, we were finding the location of
4   Asplundh.  He said if he knew the location,
5   it might relate to him, so let me get that.
6   Be right back.
7   BY MR. HARBIN:
8   Q.      Got one last question, Mr. Williams.
9   Through the -- through this deposition you
10  said that American Drum would go out and pick
11  up the containers.
12  A.      Uh-huh.
13  Q.      Did companies ever bring -- did
14  you -- did American Drum always go out and
15  pick up the containers?
16  A.      No.  People bring them to me, like,
17  drum hustlers, I tell you.
18  Q.      Okay.  And that was -- I think we
19  mentioned one, Mike and Jack?
20  A.      Yeah, and some others, too, I got to
21  get the name.
22  Q.      You're going to get those names for
23  us?
24  A.      Yes, sir, uh-hu

**Exhibit D**

142

```
 1    Q.    And the concrete company that you
 2   mentioned that was on Chelsea and Bellevue?
 3    A.    Yes, sir.  I get that name for you.
 4    Q.    You'll get that name as well.
 5    A.    Yes, sir.
 6    Q.    Can you remember what chemicals --
 7   what materials that you were dealing with in
 8   that --- with that company?
 9    A.    Which one now?
10    Q.    The concrete company.
11    A.    I think -- I don't know.  I think it
12   was brick cleaning because what I did, I took
13   the drum back to them.  I didn't, you know --
14    Q.    You didn't clean their drums?
15    A.    No, sir.  No, sir.
16          MR. SPURLIN:  I have one
17   follow-up question.  Toward the end of EPA's
18   cleanup activities out on the facility, we
19   came in and inside the warehouse there were,
20   I would say, hundreds -- a significant number
21   of the poly totes with agricultural type
22   labels on them.  They looked -- they were
23   kind of in a reinforced tote.
24          THE WITNESS:  Uh-huh.
```

```
 1          MR. SPURLIN:  So the label said
 2   paraquat, it was green in color, maybe some
 3   red, but they dye the material so the farmers
 4   can see where they apply the material.
 5          But do you remember where you
 6   obtained those containers?
 7          THE WITNESS:  I think -- I'm not
 8   sure.  I think they came from Mississippi,
 9   from airport and Clarksdale.  I think that's
10   where they came from.
11          MR. SPURLIN:  Okay.
12          THE WITNESS:  Now, this
13   Asplundh, they are not on Summer.  They in
14   Olive Branch, Olive Branch.
15   BY MR. HARBIN:
16    Q.    Did you deal with that company?
17    A.    Yeah, yes.
18    Q.    And --
19    A.    Have to get the address.  That's
20   Asplundh.
21    Q.    Okay.  But you did deal with them?
22    A.    I did.
23    Q.    And you picked up?
24    A.    Picked up a lot of drums and they
```

143

```
 1   brought drums to me, but the drums, they was
 2   so picky about their drums.
 3    Q.    Explain that to me, Mr. Williams.
 4    A.    They have two men on the truck and
 5   they check and make sure that nothing wrong.
 6   When we go load them up, they do the same
 7   thing.
 8    Q.    I'm not understanding you.
 9    A.    They were picked up and they made
10   sure their drums were clean.  Everybody had
11   sued them before.  They don't let nothing
12   leave their facility unless they are clean.
13    Q.    So all their drums that you
14   received -- that American Drum received at
15   the facility, they were clean?
16    A.    Clean.  They don't let nothing leave.
17   They got EPA guy there.
18          MR. PARRISH:  Asplundh should be
19   on Exhibit 3?
20          THE WITNESS:  Asplundh, not
21   Plundh (sic) but Asplundh, they in Olive
22   Branch, not in Memphis; Olive Branch,
23   Mississippi.
24   BY MR. HARBIN:
```

144

```
 1    Q.    That should be on Exhibit 3 as well?
 2    A.    Right, uh-huh.
 3          (An off-the-record discussion
 4   was held.)
 5   BY MR. HARBIN:
 6    Q.    I pronounced it Asplundh.  You
 7   pronounce it Asplundh.
 8    A.    Asplundh.
 9    Q.    Was that the same company we were
10   talking about earlier, Asplundh and Asplundh?
11    A.    Uh-huh.
12    Q.    And they were a customer or client of
13   American Drum?
14    A.    Right, yes, sir, uh-huh.
15    Q.    About how many drums would you pick
16   up or would they supply American Drum?
17    A.    I guess in a year's time, we're
18   talking about 3 or 400 drums.
19    Q.    Was that during the overall whole
20   operation of American Drum?
21    A.    Yeah, uh-huh.
22    Q.    Did they bring them to the facility
23   or did you pick them up?
24    A.    Both.
```

Exhibit D

146

1    Q.    Was there a written contract?
2    A.    No.
3    Q.    Did they contain any materials?
4    A.    No, sir.  They very particular, they
5    particular.
6    Q.    What drums -- what size drums?
7    A.    30 gallon, plastic, 30-gallon
8    plastic.
9              MS. RICHARDSON:  I'm done.
10             MR. HARBIN:  This is the
11   conclusion --
12             MR. PARRISH:  Whoa.  I want to
13   follow-up.
14             MR. HARBIN:  Very good.
15                  EXAMINATION
16   BY MR. PARRISH:
17   Q.    I have questions.  I'm just going to
18   be skipping around the points of
19   clarification.  I'm not starting a new thing.
20         Did you say fiber board from Newlywed
21   Foods?
22   A.    Fiber drum, yes, sir.
23   Q.    Fiber drums?
24   A.    Yes, sir.

1    Q.    And what is a fiber drum?
2    A.    Made out of cardboard.
3    Q.    So does it look like a 55-gallon
4    drum?
5    A.    It is a 55-gallon drum made out of
6    cardboard, not made out of steel or plastic,
7    but made out of cardboard.
8    Q.    And you recycle those?
9    A.    No.
10   Q.    So what did you do with them when you
11   picked them up?
12   A.    Well, people buy them to put concrete
13   cleaner, they buy them for concrete cleaner.
14   They buy them and put sawdust in them.  A lot
15   of people pack clothes in them because that
16   fiber cardboard, you put something in them;
17   you got a bag in them, all you got to do is
18   pull the bag out.
19   Q.    You don't store fluids in them?
20   A.    Oh, no.
21   Q.    And so you would pick those up?
22   A.    Uh-huh.
23   Q.    Would you pay for those?
24   A.    No, sir.

147

1    Q.    So you would get those into your
2    facility, would you sell them?
3    A.    Uh-huh, we sell them 2 or $3 a piece,
4    but a lot of people put dog food in them, put
5    clothes in them, put in flour, what you call,
6    flour.
7    Q.    As far as what is on your facility on
8    Walnut right now --
9    A.    We got drum --
10   Q.    Let me ask a preliminary question.
11         Since the EPA was there and took all
12   of what they took off of the facility, from
13   that time -- do you remember that time, when
14   that happened?
15   A.    Yes, sir.
16   Q.    You said you lost all your customers.
17   Now, since when did you lose all of your
18   customers?
19   A.    When the EPA started investigating
20   me, they went to all my customers and told
21   them they were investigating me and my
22   customers told me they couldn't deal with me
23   no more.
24   Q.    Was that before EPA cleaned off the

148

1    facility or after?
2    A.    During the same thing.
3    Q.    And that was 2007?
4    A.    Uh-huh.
5    Q.    And so you are still running a
6    business?
7    A.    Uh-huh.
8    Q.    I presume then you have customers of
9    some kind?
10   A.    Yeah, uh-huh.
11   Q.    What do you -- do you sell and buy;
12   buy and sell?
13   A.    What we do, we mostly pick up drums,
14   crush them for steel and sell drum for
15   grinding up with plastic, you know, like
16   right now what all's in the warehouse is
17   plastic and then the guy's going to pick it
18   up and take it to Jackson and we get
19   something off that.
20   Q.    You go to facilities that have drums?
21   A.    Uh-huh.
22   Q.    And you pick up drums?
23   A.    Uh-huh.
24   Q.    The drums that you pick up from

Exhibit D

1    facilities since what happened in 2007, do
2    they have any residue in them?
3    A.    No.
4    Q.    Are those cleaned drums?
5    A.    Clean drums.
6    Q.    And you bring them back to your
7    facility?
8    A.    Uh-huh.
9    Q.    Crush them?
10    A.    Uh-huh.
11    Q.    And sell them as you have just
12    stated?
13    A.    Uh-huh.
14    Q.    Do you pay for them when you pick
15    them up?
16    A.    No.
17    Q.    What causes you to go to a place to
18    pick up the drum?
19    A.    Need work.
20    Q.    Now you can talk to both of us at the
21    same time.  So what -- do the facilities that
22    have drums call you and ask you to come to
23    them?
24    A.    Uh-huh.

1    Q.    Is that how you get there?
2    A.    Yes, sir, that's how I get there.
3    Q.    You're not just going from door to
4    door?
5    A.    No, sir, I'm not.
6    Q.    So some facility will say, I've got
7    some drums, you come and I'll give them to
8    you?
9    A.    Right.
10    Q.    And when do you check to see if they
11    are clean?
12    A.    I ask them -- I say, Make sure that
13    they've been cleaned, I can't pick up a drum
14    with anything in it.  And then when my guy
15    get there before they -- see, my guy will
16    lift and put it on the truck and they make
17    sure they are clean before they put them on
18    the truck.
19    Q.    Now, that's part of your business.
20    A.    Uh-huh.
21    Q.    So you're selling them for scrap?
22    A.    Scrap mostly.
23    Q.    How much do you get for them?
24    A.    We may get 3, $400 for a truckload of

1    scrap.  Also we got some plastic, we sell
2    them to people who put clothes in them and we
3    get 7, $8 a drum.
4    Q.    You pick up plastic?
5    A.    Uh-huh.
6    Q.    It's cleaned?
7    A.    They clean.
8    Q.    Same as you said for the others?
9    A.    Uh-huh.
10    Q.    And then you'll sell that one to
11    people who need it to store things?
12    A.    To store stuff, whatever they want to
13    throw in it.
14    Q.    That might just be citizens?
15    A.    Dog food, clothes, whatever they
16    want.
17    Q.    And then what are you doing with
18    pallets?
19    A.    Okay.  Pallet, we sell pallet for
20    people to put stuff on.  We got a lot of
21    plastic pallet, we sell them for people to
22    grind up, this place in Jackson, we sell them
23    a lot to grind up.
24    Q.    Where do you get the pallets?

1    A.    Different companies.
2    Q.    Do they call you?
3    A.    They call me.
4    Q.    They call you?
5    A.    Uh-huh.
6    Q.    How much do you pay for those
7    pallets?
8    A.    Nothing.
9    Q.    So you're just getting them off their
10    hands?
11    A.    Yes.
12    Q.    Bringing them back?
13    A.    Bringing them back.
14    Q.    Some of them you sell as containers?
15    A.    Right.  And some I sell for the
16    people to use to put bags or whatever they
17    going to put in them.
18    Q.    All right.  That's pallets.  That's
19    drums.  What else do you have there?
20    A.    Tote tank.
21    Q.    Tote tank?
22    A.    Uh-huh.
23    Q.    Same situation?
24    A.    Yeah, uh-huh.

Exhibit D

1   Q.      Is that the entirety of your business
2   right now?
3   A.      That's the entirety of my business.
4   Q.      And has been since 2007?
5   A.      Since 2007, sure has.
6   Q.      So how would any residue -- how would
7   any containers with residue get on to your
8   facility?
9   A.      I don't know, unless somebody dropped
10  them off.
11  Q.      Do you know of any that have been
12  dropped off at your place?
13  A.      No.  May have, but I don't know.  I
14  haven't found none, I'll put it that like
15  that.
16  Q.      None of your employees have told you
17  that they were dropped off?
18  A.      No, sir.  No, sir.
19  Q.      You were asked -- you were asked a
20  question that had in it that you had done a
21  lot of business with crop dusters.
22  A.      Uh-huh.
23  Q.      Have you done any business with crop
24  dusters, other than what you have related in

1   your testimony today?
2   A.      No, sir, I haven't.
3   Q.      So if that's a lot, that's how much
4   you've done?
5   A.      Yeah, that's all I done.
6   Q.      You said about residue and CCL drums.
7   A.      Uh-huh.
8   Q.      If a CCL drum had residue in it, what
9   would you do?
10  A.      I wouldn't take it.
11  Q.      You wouldn't take it?
12  A.      No.
13  Q.      So when you referred to residue and
14  CCL drums, you were describing drums that you
15  did not take ownership of?
16  A.      Right, uh-huh.  And then we haven't
17  took any since the -- in fact, I lost all my
18  customers.  I don't have CCL.
19  Q.      Let's go back now, I'm talking about
20  CCL before 2007.
21  A.      Yeah, uh-huh.
22  Q.      If a CCL drum had residue in it --
23  A.      If I knew it, I wouldn't take it.
24  Q.      Did you pick up the CCL drums?

1   A.      Yes, sir, before.
2   Q.      Now, just use CCL as an example, did
3   you pay CCL for drums you picked up from
4   them?
5   A.      No, sir.
6   Q.      So as far as all of these drums
7   you've spoken of that you picked up, at any
8   time since 2003, have you paid for drums?
9   A.      Yes, sir, I pay Smucker for some,
10  Rich Foods.
11  Q.      Rich Foods?
12  A.      Uh-huh.  Farrell Calhoun.
13  Q.      Farrell Calhoun.
14  A.      That be the only -- and the other
15  company.
16  Q.      Asplundh?
17  A.      No, we don't pay them for nothing.
18  (Indecipherable), you had them down.
19          MR. HARBIN:  Say that again.
20          THE WITNESS:  Kraft
21  (indecipherable).
22  BY MR. HARBIN:
23  Q.      Nabisco Kraft?
24  A.      Nabisco, yeah.

1   Q.      You paid them for drums?
2   A.      Right.
3   Q.      How much would you pay them for their
4   drums?
5   A.      Two dollars a drum.
6   Q.      What would be the difference in
7   whether you would pay somebody for their
8   drums or you didn't pay somebody for their
9   drums?
10  A.      Well, when you didn't pay for drums,
11  they mostly big company that want to move
12  them to keep the place clean.  When you pay
13  somebody for a drum, most of the guys keep
14  them, they want to get money out and they
15  want to keep the place clean, so they stack
16  up; and what they do, the guy's who working
17  there will look out for you and make sure
18  that you pay him to get the drum.
19  Q.      So would you pay if they asked to be
20  paid?
21  A.      Uh-huh.
22  Q.      And if they --
23  A.      If they didn't, I didn't pay them.
24  Q.      But you paid $2

Exhibit D

1    A.    Two dollar per drum.

2    Q.    And would you sell the drums that you

3    picked up for the same amount, whether you

4    paid for them or not?

5    A.    No.

6    Q.    What determined what you sold the

7    drums for?

8    A.    Depends on the shape of the drum.

9    Q.    What shape demanded what price or

10   what do you mean by that?

11   A.    Well, if a drum not bent or anything,

12   we could sell a drum anywhere from $8 to $9.

13   Same way with tote tank.  But if a drum bent,

14   a lot of time people don't want them and we

15   let them go for $5; and if it too bad,

16   crushing, it goes for scrap.

17   Q.    There are three things you would do

18   with drums that you would pick up.

19   A.    Uh-huh.

20   Q.    One is you would sell it for $8 to

21   $9?

22   A.    Uh-huh.

23   Q.    You would sell it for $5?

24   A.    Uh-huh.

---

1    Q.    Or you would crush it?

2    A.    Right.

3    Q.    And sell it for scrap?

4    A.    Scrap.

5    Q.    And the thing that determined whether

6    you got 8 to $9 or $5 or you crushed it was

7    whether it was dented or not?

8    A.    The shape of the drum, yes, sir.

9    Q.    Quantity-wise, if you can relate to

10   that, what percentage of your drums would you

11   sell for 8 to $9?

12   A.    Say about 80 percent of them.

13   Q.    And then there's 20 percent left.

14   From that 20 percent, how many would you

15   crush and how many would you sell for $5?

16   A.    I would say we crushed about 10

17   percent of them, the rest.

18   Q.    50-50 of the remaining 20 percent?

19   A.    (Witness nodded head up and down.)

20   Q.    Do you have any recollection of what

21   the total revenue your company took in in

22   2006?

23   A.    I got it somewhere on paper because I

24   file the tax.  So I get it for you if you

---

1    need it.

2    Q.    Yes, I would need it.  Do you have

3    any way of estimating right now, do you know --

4    A.    2006, we did pretty good; I would say

5    about 200 and some thousand.

6    Q.    So that's the range --

7    A.    That's the range, uh-huh.

8    Q.    -- in which you were operating.

9          Last year, what were your revenues?

10   A.    Nothing.  We lost -- we lost all our

11   saving.  We lost everything.

12   Q.    The Great Dane drums that you

13   referred to, I want to be sure I understood,

14   those were on the premises when you bought

15   the premises?

16   A.    Yes, sir.

17   Q.    Did you handle those drums at all?

18   A.    No.

19   Q.    From the time you purchased the

20   premises, what was the interaction you had

21   with those drums at all?

22   A.    I don't remember none at all.  We may

23   have moved them around, you know, but I don't

24   remember any at all.

---

1    Q.    Were they sitting out?

2    A.    Sitting out up on the shed and on the

3    trailer.

4    Q.    And the gasoline -- let me rephrase

5    that.

6          The rags you used to clean the drums

7    with gasoline, how many times were those rags

8    used?

9    A.    One time.

10   Q.    And what kind of rags were they?

11   A.    Just a towel, a towel.

12   Q.    Were they scrap or did you buy rags?

13   A.    We bought rags from the rag place,

14   the rag man, Blockman (phonetic) Rag Company.

15   Q.    You use them one time?

16   A.    Uh-huh.

17   Q.    And then put them in a barrel?

18   A.    Uh-huh.

19   Q.    That's what you call disposing of

20   them?

21   A.    Right.

22   Q.    You put them in a barrel?

23   A.    Uh-huh.

24   Q.    And was this an open-end barrel

Exhibit D

162

```
1    A.    Where you pull the top and lock it
2    down.
3    Q.    So you would put the rags in there.
4    A.    Uh-huh.
5    Q.    And lock down the barrel?
6    A.    Yes, sir.
7    Q.    And then when you put more rags in
8    there, did you --
9    A.    Lock it off.
10   Q.    Did you take the top off and put the
11   rag in there and lock it down?
12   A.    Uh-huh.
13   Q.    How many rags would it take to fill
14   up a barrel?
15   A.    Quite a few.  We buy them in 25-pound
16   box, so I would say anywhere between five to
17   six boxes to fill it up.
18   Q.    Why did you dispose of them in that
19   way rather than some other way?
20   A.    Well, I didn't want them all over the
21   place and I wanted them in one container, one
22   place, you know, that we know where it was,
23   what it was and disposed of.
24   Q.    And how many barrels of used rags did
```

```
1    you have in 2007?
2    A.    I don't know.
3    Q.    How long would it take you to
4    accumulate a barrelful of rags?
5    A.    I would say anywhere from three to
6    four months.
7    Q.    How many rags did you use to wipe
8    down a barrel?
9    A.    Two or three rags, they be -- cut up
10   in pieces, you know, like little small towel.
11   Q.    So every barrel that came in there
12   and you painted the barrel, you used two to
13   three rags?
14   A.    Uh-huh, to wipe it down.
15   Q.    And every time you wiped a barrel
16   down, you put those rags in your disposal
17   barrel?
18   A.    In the drum, yes, sir.
19   Q.    You used the word discover at one
20   point, you said you did not discover them,
21   and I think you were referring to drums that
22   were left on the premises?
23   A.    Yes, sir.
24   Q.    Is it your testimony that those were
```

163

```
1    on your premises and you did not even know
2    they were on your premises?
3    A.    Well, the one that was on the
4    premises, I didn't know what was in them.
5    Q.    But you knew physically those drums
6    were on that premises?
7    A.    They was on the premises.
8    Q.    So there weren't any drums that were
9    hidden somewhere?
10   A.    Oh, no, no.
11   Q.    And so what did you mean when you say
12   discovered?  Did you mean discovered the
13   contents?
14   A.    Yeah.  What I mean, I didn't discover
15   until the Memphis City Code Enforcement and
16   Ms. Harding from the EPA came around.
17   Q.    And then you discovered the content?
18   A.    Right.  That's when we started taking
19   action.  Once we discovered, we started
20   taking actions.
21   Q.    You were asked about a chemical that
22   was referred to as TEC (sic).  Do you even
23   know what TEC (sic) is?
24   A.    No.
```

```
1    Q.    Do you know what TEC (sic) is used
2    for?
3    A.    No, sir, I don't.
4    Q.    And until Mr. Spurlin said what the T
5    and E and C stood for --
6    A.    I didn't know.
7          MS. RICHARDSON:  Larry, it's
8    TCE.
9    BY MR. PARRISH:
10   Q.    All right.  TCE, everything I just
11   said, TCE.
12          So when did you discover that there
13   was TCE on the premises?
14   A.    Today.
15   Q.    Today?
16   A.    Uh-huh.
17   Q.    So you don't really know whether it
18   was there or not?
19   A.    No.
20   Q.    If it was there, was it there before
21   you purchased the premises?
22   A.    It had to be, because I didn't know.
23   Q.    You were talking about when you owned
24   the drums and when you
```

Exhibit D

1   A.    Uh-huh.

2   Q.    You just said when you picked the

3   drums up -- let me start this whole thing

4   over again.

5         When did you pay the $2 for drums

6   that you paid $2 for?

7   A.    When we found out the drums was

8   exceptionally clean, we'd use them.

9   Q.    So would you go to the facility and

10  bring them back to your facility --

11  A.    Uh-huh.

12  Q.    -- and inspect them?

13  A.    Yes, sir.

14  Q.    And if the drums were not clean, you

15  would not pay the $2 --

16  A.    I wouldn't pay.  I would give them

17  back to the people.

18  Q.    You would physically take them back?

19  A.    Yeah.

20  Q.    Once you paid your $2, you had

21  inspected them --

22  A.    Right.

23  Q.    -- and known them to be clean?

24  A.    Right, yes, sir.

---

1   the only thing I knew.

2   Q.    All you knew about standards was, for

3   you to accept a drum, it had to be clean?

4   A.    Clean, yeah.

5   Q.    But you didn't take a written program

6   to EPA --

7   A.    No.

8   Q.    -- and ask if that is acceptable --

9   A.    No.

10  Q.    -- or approved?

11  A.    No.

12  Q.    Did any -- whether it was EPA or code

13  enforcement or the fire department or anybody

14  else, did anybody else approve a written plan

15  of acceptance?

16  A.    The city and the state water

17  pollution, what is it, water permit, they the

18  only one that came in and told what to do,

19  how to do and told and sat there with him, we

20  had a guy come in from Nashville.  EPA -- we

21  asked them what to do.  They didn't know.

22  Q.    When was that?

23  A.    That was back about 2000, the guy

24  name was Gay -- I got a card -- we going

---

1   Q.    You were asked about your,

2   quote-unquote, acceptance program.

3   A.    Uh-huh.

4   Q.    Did you have anything that you would

5   call a, quote-unquote, program for

6   acceptance?

7   A.    No more than before accept them, make

8   sure that the drum was clean, the employees.

9   Q.    You know what you did before you

10  accepted a drum and became its owner?

11  A.    Uh-huh.

12  Q.    Right?

13  A.    Yes, sir.

14  Q.    As far as that being a program, was

15  that ever written out and approved by

16  anybody?

17  A.    No, sir, it wasn't.

18  Q.    And you were asked whether your

19  acceptance program met EPA standards.  Did

20  you even know there were EPA standards for

21  acceptance?

22  A.    No, no more than I know EPA standard

23  was that all the drums that what you get in

24  supposed to be cleaned, I knew that, that's

---

1   to -- we asked him -- now, the city led us

2   hand by hand, told us what to do, what not to

3   do.  When we got to the EPA, they told us

4   they didn't know.

5   Q.    This was Mr. Who?

6   A.    Mr. Gay, I believe.  I got a card.

7   Q.    G-A-Y?

8   A.    G-A-Y.

9   Q.    G-A-Y?

10  A.    I got a card.

11  Q.    And he was from Nashville?

12  A.    Uh-huh.

13  Q.    And he came because you asked him to

14  come?

15  A.    We asked him to come lead us what to

16  do.

17  Q.    Now, the water people that you had

18  referenced to, that's city, you said?

19  A.    City and county.

20  Q.    City of Memphis, Memphis, Shelby

21  County?

22  A.    Yeah, same.

23  Q.    Health department?

24  A.    Uh-huh.

Exhibit D

```
1   Q.   Maybe?
2   A.   Uh-huh.
3   Q.   Now, you say they walked through it
4   with you step by step?
5   A.   Step by step.
6   Q.   Did that include what you're to do
7   before you accept?
8   A.   Right.
9   Q.   Okay.  So this process of you looking
10  at the drums and making sure they are clean
11  before you took them in, the water pollution
12  people knew that's what you did?
13  A.   What we did.
14  Q.   And did they tell you that is
15  appropriate?
16  A.   Appropriate -- way to do it.
17  Q.   And then you said they walked you
18  through step by step?
19  A.   Step by step.
20  Q.   So everything you have said today in
21  answer to Mr. Harbin's questions about how
22  you operated step by step, the water
23  pollution people instructed you --
24  A.   Right.
```

```
1   Q.   -- that that's how you were to do it?
2   A.   Right.
3   Q.   Did you follow their instructions?
4   A.   Yes, sir.
5   Q.   Did they ever come back to check?
6   A.   Sure did.  Sure did.
7   Q.   So how often did they come back?
8   A.   About once every 90 days.
9   Q.   And they would come back to check to
10  be sure that you were doing --
11  A.   Doing what we said we would do.
12  Q.   -- as they instructed?
13  A.   Right.
14  Q.   Now, this filtration system or
15  process that you described --
16  A.   Uh-huh.
17  Q.   -- did the water pollution people
18  know what you did by way of filtration?
19  A.   Yes, sir.
20  Q.   Did they inform you that the filter
21  or filtration process you were using was
22  acceptable?
23  A.   Yes, sir.
24  Q.   And did they tell you that the water
```

```
1   that was filtered in that process was clean
2   to go back into the sewer system?
3   A.   Yes, sir.
4   Q.   Was that their main problem?
5   A.   Uh-huh.  If they didn't, they
6   wouldn't okay the permit.  We got an okay
7   permit.
8   Q.   That's a sewer permit?
9   A.   Sewer permit.
10  Q.   And did the water pollution people
11  know what kind of filters you had that were
12  filtering out the solids?
13  A.   Yes, sir, uh-huh.
14  Q.   And did they tell you those were
15  acceptable filters?
16  A.   Acceptable.
17  Q.   And did the water pollution people
18  tell you what to do with the solids that were
19  filtered out?
20  A.   Yes, sir.
21  Q.   And did they tell you to put those
22  solids in a drum?
23  A.   Drum, sure did.
24  Q.   And when they came back to inspect,
```

```
1   did they know that you were putting those
2   solids in the drum?
3   A.   Yes, sir.
4   Q.   Did you have multiple drums that
5   contained this filtered material?
6   A.   No, sir.
7   Q.   How many drums did you have?
8   A.   We get one drum about every six
9   months, four or five months.  Like I say,
10  we're a small operation.  We wasn't doing a
11  lot.
12  Q.   And what would you do with those
13  drums when you filled them up?
14  A.   We had them capped and set over in
15  the corner.
16  Q.   Did the water pollution people ever
17  inform you that you had some obligation to do
18  something with those drums at any point,
19  other than sit them in the corner?
20  A.   Oh, no.  They told me I needed to get
21  a -- what you call it, the disposal,
22  whatever, like, I think at that time we
23  talking about, what the big -- I forget the
24  name of the company, B...[unclear]...when
```

Exhibit D

174

1    Q.    I didn't understand what you did.
2    A.    They told me I need to get a
3    reputable company to come in and test, like
4    BFI.
5    Q.    B --
6    A.    BFI.
7    Q.    BFI, that's the waste disposal
8    company?
9    A.    Uh-huh.
10   Q.    And you needed to get them to come in
11   and do what?
12   A.    Test the drum so they'd know what to
13   do with it.
14   Q.    Test the drum into which you were
15   putting the solids that were filtered out of
16   the water?
17   A.    Uh-huh.
18   Q.    And did they do that or --
19   A.    No.
20   Q.    You did not do that?
21   A.    No, because they were sitting in the
22   corner and then when the EPA came in and they
23   moved all that themselves.
24   Q.    So the EPA took those drums?

1    A.    Uh-huh, they took all of them.
2    Q.    And for how long before the EPA took
3    those drums had you been told to get BFI or
4    some company to come in and tell you what to
5    do with those drums?
6    A.    I guess about two or three year
7    because we didn't accumulate that much.
8    Q.    Okay.  And did the water pollution
9    people know that you were disposing of these
10   rags that you had used to wipe gasoline on;
11   did they know what you were doing with those
12   rags?
13   A.    No, they never did.  The only thing
14   they were concerned about is the sewer
15   system.  They weren't concerned about nothing
16   else.
17   Q.    As far as the decision to dispose of
18   those rags in the way that you were disposing
19   of them was concerned, who made that
20   decision?
21   A.    I think the guy that came down from
22   Nashville.
23   Q.    Mr. Gay?
24   A.    I believe Mr. Gay.  I have to get the

175

1    card and ask Gray to make sure.
2    Q.    Well, did somebody tell you that that
3    was an adequate way to dispose of those rags?
4    A.    Yes, sir.
5    Q.    When I say somebody, I mean somebody
6    in official --
7    A.    Knew what they were doing, official
8    position, yes, sir.
9    Q.    Were you told that at some point you
10   would have to move the rags that had been
11   disposed of in those drums?
12   A.    Yes, sir.
13   Q.    And what were you told about that?
14   A.    Told that I needed to get a reputable
15   person to move them and see where they needed
16   to go.
17   Q.    A reputable person?
18   A.    Like BFI.
19   Q.    Like BFI?
20   A.    Uh-huh.
21   Q.    Did you ever ask BFI to come in and
22   take the drums?
23   A.    We did.  BFI never came -- I think it
24   may have been AllStar.  They had several

176

1    companies that do it.  We asked them, but we
2    got -- in fact, I think we got quotes on
3    them.
4    Q.    And did they ever take any of those
5    drums with those rags in them?
6    A.    No, sir.
7    Q.    And why not?
8    A.    We didn't finalize the deal.
9    Q.    So you had people like BFI and
10   AllStar and maybe others come in and quote
11   you a price?
12   A.    Right.
13   Q.    And before the EPA took those drums,
14   you had not made any deal?
15   A.    No deal at all.
16   Q.    Do you know how many of those drums
17   there were?
18   A.    No, I don't.  Not sure.
19   Q.    You said something about A&L Labs?
20   A.    They were testing the sewer water,
21   A&L Lab.
22   Q.    They weren't having anything to do
23   with the rags?
24   A.    Oh, no.

Exhibit D

178

1   Q.      What's the difference, if any, in
2   recycling and reconditioning?  You've used
3   both of those terms.
4   A.      Okay.  Recycling and recondition the
5   same thing.  You recycle drum.  You condition
6   pallets.
7   Q.      So that would be a distinction,
8   though?
9   A.      Uh-huh.
10  Q.      Now, you were doing pallet work all
11  during the same time?
12  A.      Same time doing drum work.
13  Q.      And the pallets, how would you
14  recondition a pallet?
15  A.      You bring in -- bring in 2, 300
16  pallets, a board broken there, a board broken
17  there, you just take -- pull the broken board
18  off and put a new board on it, is how you do.
19  Q.      This is hammer and nail stuff?
20  A.      Hammer and nail.
21  Q.      And how much would you sell a pallet
22  for?
23  A.      Anywhere between 4 and $5.
24  Q.      And did you ever pay anybody for

1   pallets?
2   A.      Very few.  A dollar to a hustler
3   bringing a pallet, a dollar, dollar and a
4   half.  And a lot of people -- a lot of
5   companies will pick up pallets just to move
6   them off the premises.
7   Q.      And you would recondition them as
8   you've stated?
9   A.      Uh-huh.
10  Q.      And then to whom would you sell them?
11  A.      Oh, a lot of people.  Different
12  people like chemical companies, soap
13  companies, glue company, paint company, you
14  know.
15  Q.      But those pallets, there was nothing
16  chemical about the reconditioning?
17  A.      No, no.
18  Q.      I think you referred to order in the
19  sense of getting an order; do you recall
20  that?
21  A.      Uh-huh.
22  Q.      What is "getting an order"?
23  A.      I mean when somebody need 50 drums,
24  they may call us and say they have 50 drums

179

1   and I have to get the order together.  I may
2   need 100 pallets, like the firecracker place
3   on 61 called and they want 25 pallets and I
4   got to go in and get 25 pallets and we'll
5   take them in.
6   Q.      So these are customers that would
7   call you?
8   A.      Uh-huh.
9   Q.      And what they would give you is an
10  order for --
11  A.      To be filled.
12  Q.      And then what you would do is fill
13  that order?
14  A.      Yes, sir.
15  Q.      And sometimes you would have it on
16  the premises?
17  A.      Uh-huh.
18  Q.      And you would fill it?
19  A.      Right.
20  Q.      Sometimes you'd have go back --
21  A.      Right, right, go out and get it.
22  Q.      Somebody might want 100 pallets?
23  A.      Uh-huh.
24  Q.      And you had 50?

180

1   A.      I had to go out and find another 50.
2   Q.      You also referred to a contract and
3   get a contract.  How is that different from
4   an order?
5   A.      Well, a small company like me -- they
6   only deal with big company with a contract.
7   When you sign a contract, you tell a guy you
8   going to give him 500 pallet a week, well, he
9   can hold you accountable if you don't give
10  him 500.  If he lying down and you can't
11  produce, he can hold your contract, but when
12  you fill orders and they tell you they need
13  50 drums or 50 pallets, you take them
14  whenever you have an order complete.
15  Q.      Did you ever have any contracts?
16  A.      Never had any contracts.  Too small
17  for contracts.
18  Q.      You answered questions at the
19  beginning that you were, quote-unquote,
20  self-employed.
21  A.      Right.
22  Q.      You think of yourself as
23  self-employed, do you not?
24  A.      Yes, sir.

Exhibit D

182

```
 1    Q.      But you've never operated as a sole
 2    proprietor?
 3    A.      No.
 4    Q.      You've always operated as an employee
 5    of a corporation that you own?
 6    A.      Right, small business.
 7    Q.      So in your mind, that's being
 8    self-employed?
 9    A.         Self-employed, me it is, I do more
10    work than anybody.
11    Q.      But you're no more self-employed than
12    I am self-employed; I'm employed by Larry E.
13    Parrish, PC.
14    A.      Uh-huh.
15    Q.      Now, your educational background and
16    I'm finished.  You said you had some training
17    at a community college.
18    A.      Community college.  That was in auto
19    mechanics.  See, when I went to school back
20    in the '50s, late '40s and '50s, we went to
21    school two or three months, but when cotton
22    in the field, we didn't go.  We went to pick
23    cotton.  We went to school from, let's say,
24    from January to March, and then we had to
```

```
 1    quit school in March and go chop cotton.
 2    They layoff on 4th of July until the cotton
 3    be ready to pick.  Then we went to school
 4    from 4th of July until October.  October we
 5    had to pick cotton and so everything we have
 6    secondhand.
 7    Q.      You grew up in segregated
 8    Mississippi; is that correct?
 9    A.      Sure did.
10    Q.      And when you said you went to school,
11    you went to what kind of school?
12    A.      Little old church house school.
13    Q.      And how many students were there?
14    A.      10 or 15, you may have five when I
15    come along in our class when Emmett Till got
16    killed in 1955, they built us a new school in
17    '56; and when I graduated in '62 we had 25,
18    30 kids graduate in the whole county.
19    Q.      How many teachers did you have?
20    A.      Something like five or six.
21    Q.      And did teachers teach lots of
22    different grades?
23    A.      Yeah, different grades.  In fact, you
24    may have one teacher teaching four or five
```

183

```
 1    grades and different things like that.
 2    Q.      It was a totally segregated school?
 3    A.      Yeah.  We had to walk a mile to
 4    school, a little church house, you know.
 5    Q.      I think my daddy had to walk more and
 6    more miles the older he got.
 7            But that was your educational
 8    background?
 9    A.      Educational background.
10    Q.      And at that time you were one of 13
11    children, were you not?
12    A.      Yes, oldest boy.
13    Q.      And who was in the house that raised
14    those 13 kids?
15    A.      My mom.
16    Q.      And you?
17    A.      Uh-huh.
18    Q.      You didn't have a daddy, did you?
19    A.      (No verbal response.)  Sorry.
20    Q.      Who was the sole bread winner for
21    those 13 kids?
22    A.      Me and my mom.
23    Q.      And when you say you went to a
24    community college, where was that community
```

```
 1    college?
 2    A.      Clarksdale, Mississippi.
 3    Q.      Clarksdale?
 4    A.      Yes.
 5    Q.      Do you have a high school diploma?
 6    A.      Uh-huh.
 7    Q.      And the community college you went
 8    to, did you go to it right after high school?
 9    A.      Right after high school.
10    Q.      Was it segregated?
11    A.      Yeah.
12    Q.      How long were you there?
13    A.      About a year, auto mechanic, I was on
14    a plantation, I knew how to do work on
15    tractors and trucks and combines at cotton
16    picking time.
17    Q.      And after you got out of school, did
18    you continue to be the only bread winner for
19    those 13 -- 12 other kids?
20    A.      Yeah.  In '65, moved to Memphis.
21    Q.      Moved to Memphis?
22    A.      Went back and got my mom and all the
23    kids, about 18 or something in one house.
24    Q.      18 of you in one house in Memphis?
```

Exhibit D

1    A.    Uh-huh.
2    Q.    In 1965?
3    A.    Uh-huh.
4    Q.    And can you read and write?
5    A.    Not the best.
6    Q.    To be in the businesses you have been
7    in, you've had to have somebody nearby, like
8    a Glover Gray?
9    A.    Right.
10   Q.    Without a person like that --
11   A.    I couldn't make it.
12   Q.    -- you can't do it?
13   A.    No.
14   Q.    You don't read well enough to do
15   that?
16   A.    No, I don't.
17   Q.    You don't write well enough to do
18   that?
19   A.    Uh-uh.
20   Q.    So what you're able to do, you do
21   orally?
22   A.    Oral, right.
23   Q.    You have cancer right now?
24   A.    Uh-huh.

1    Q.    Prostate cancer?
2    A.    Yes, sir.
3    Q.    You're wife has cancer right now?
4    A.    She's diabetic and she had her
5    thyroid taken out.
6    Q.    She's a nurse, right?
7    A.    A nurse for 42 years.
8    Q.    She's been a bread winner in your
9    house?
10   A.    Uh-huh.
11   Q.    But now she's sick?
12   A.    She's sick.
13   Q.    You have a brother that has just
14   contracted cancer and moved in with you,
15   right?
16   A.    Yeah.  My baby sister, yeah, and
17   brother, all of them, all of them sick except
18   me.  My baby sister she -- been waiting for
19   the state, she got cancer, breast cancer; my
20   brother got a kidney went out on him; my
21   other brother had double pneumonia; my other
22   brother had high blood.
23   Q.    You say all of them are sick but you?
24   A.    Uh-huh.

187

1    Q.    But now you have cancer?
2    A.    Yeah.
3    Q.    You've been taking care of your
4    brothers and sisters all their lives, have
5    you not?
6    A.    Uh-huh.
7    Q.    And you are a born-again Christian
8    man?
9    A.    Right.
10        MR. PARRISH:  I have no further
11   questions.
12        MR. HARBIN:  I have just a few
13   more questions, Mr. Williams.
14        EXAMINATION
15   BY MR. HARBIN:
16   Q.    I want to get back to American Drum
17   at 806 Walnut Street.  Exhibit 1, just for
18   clarification, Exhibit 1, I think you said,
19   was completed by Mr. Gray?
20   A.    Uh-huh.
21   Q.    It says that drums for pickup or drop
22   off are inspected for compliance with EPA
23   standards.
24   A.    Uh-huh.

188

1    Q.    And just for clarification, do you
2    know what those standards are?
3    A.    No.  He knows.
4    Q.    We've talked about empty drums
5    throughout this deposition.  What constitutes
6    an empty drum?
7    A.    I guess nothing in it, just, you
8    know, the way I see it.
9    Q.    Would it have -- could it have been
10   wet with material or have material on the
11   wall of it or material in the bottom of it
12   and still constitute an empty drum?
13   A.    Not to your-all's spec, I wouldn't.
14   Q.    To your spec, would that constitute
15   an empty drum?
16   A.    To my spec it would.
17   Q.    So it could have material on the side
18   wall and in the bottom of it, but it would
19   still be an empty drum?
20   A.    To my spec, it would be; you know
21   that's my knowledge.
22   Q.    And your inspector was Mr. Wilkerson?
23   A.    Uh-huh, James Wilkerson.
24   Q.    So you would ha

Exhibit D

190

```
 1   that could have had material on the side wall
 2   and in the bottom of it as an empty drum?
 3        A.      I wouldn't, but I don't know what he
 4   did.
 5        Q.      And just for clarification, we may
 6   have asked this earlier, I'm not certain, but
 7   A&L Labs -- we talked about A&L Labs.  Did
 8   A&L Labs test the filtration residue?
 9        A.      Uh-huh, as far as I know, yes, sir.
10   We got some quote on them, you know, what
11   they found, but I have to go through Gray to
12   get that.
13        Q.      We talked about hazardous waste at
14   the facility.  Do you know if any hazardous
15   waste determination called a RCRA, R-C-R-A,
16   RCRA hazardous waste determination was ever
17   done on any of the materials that came into
18   the American Drum facility?
19        A.      No, sir, I don't know.
20        Q.      You talked about Mr. Gay.  Was
21   that -- was Mr. Gay a state of Tennessee
22   employee or --
23        A.      I think so.  I'm not for sure.  Have
24   to find the card, but he's the one got them
```

```
 1   down from Nashville.
 2        Q.      He would not have been an EPA
 3   employee, he would have been a state
 4   employee?
 5        A.      State, yeah.
 6        Q.      I'm still trying to understand about
 7   the Great Dane and the Hoover trailer.  The
 8   material in the trailer, correct me if I'm
 9   wrong, but that came from -- that was Great
10   Dane material that was on the property, you
11   say, was on the property before you-all
12   purchased the property?
13        A.      Yeah.  Well, Great Dane drums, put it
14   like that, Great Dane drums, had the name on
15   it, I'll put it like that.
16        Q.      And it was inside a trailer?
17        A.      Yes, sir.
18        Q.      That was marked Hoover on the side of
19   it?
20        A.      Uh-huh.
21        Q.      Is that correct?
22        A.      Yes, sir.
23        Q.      And I understood you to tell
24   Mr. Parrish that you-all moved that around
```

191

```
 1   the facility a couple --
 2        A.      I said may have moved.  I didn't know
 3   for sure.  I didn't know what was in them,
 4   you know.
 5        Q.      Did you ever look in the trailer to
 6   see what was in there?
 7        A.      Yeah, the trailer, but the top was on
 8   the drum, I didn't know, you know, what was
 9   in them.
10        Q.      Did you ever move them out of the
11   trailer?
12        A.      No, sir.  I only moved mine when Mr.
13   Steve told us what to do, and how to do it,
14   we moved it then.
15               MS. RICHARDSON:  The corporation
16   now at 806 Walnut Street, who is the
17   president?
18               THE WITNESS:  My son quit.  I
19   guess I am now.  You know, they left -- my
20   daughter and him both left in 2'05 or 2'06,
21   they all left.  I'm the only one there now.
22   They pursued better -- other job, I guess.
23               MR. PARRISH:  President by
24   default.
```

192

```
 1               MR. SPURLIN:  Just to clarify,
 2   currently, the operations you have do not
 3   include the refurbishing, hence the washing
 4   and painting and cleaning of the drums that
 5   you were previously doing?
 6               THE WITNESS:  No.
 7               MR. SPURLIN:  And --
 8               THE WITNESS:  We rinse out drum
 9   that come in from like Smucker Jelly, Rich
10   Foods, they come in, we wipe them out, but
11   they always be clean.  We rinse them out.
12               MR. SPURLIN:  So your discharge
13   to the city sewer will continue and hence the
14   requirements for the testing put upon you
15   that I think A&L is probably doing for you.
16               THE WITNESS:  Yes, sir.
17               MR. SPURLIN:  Thank you.
18   BY MR. HARBIN:
19        Q.      You understand, Mr. Williams, there's
20   some items in this deposition, some
21   information, some further information that
22   you have indicated you would get to
23   Mr. Parrish.
24        A.      Yes, sir.
```

Exhibit D

194

```
 1          MR. PARRISH:  I don't know if it
 2    would be possible for the court reporter to
 3    scan through there and give me a list of
 4    those or we just have to wait for the
 5    transcript, but as soon as we get that -- I
 6    haven't been making notes myself.
 7          MR. HARBIN:  And I have not
 8    either.
 9          THE COURT REPORTER:  Order?
10          MS. RICHARDSON:  Original and
11    one.
12          (An off-the-record discussion
13    was held.)
14          MR. HARBIN:  This is the
15    conclusion of Johnnie Williams' deposition
16    with the right -- EPA reserves the right to
17    call him to testify again.
18          (The deposition concluded at
19    1:30 p.m.)
20
21
22
23
24
```

```
 1          COURT REPORTER'S CERTIFICATE
 2
 3    STATE OF TENNESSEE:
 4    COUNTY OF SHELBY:
 5
 6          I, MONNA J. MCCORMICK, RPR, CLR,
 7    CRR, Reporter and Notary Public, Shelby
      County, Tennessee, CERTIFY:
 8          1.   The foregoing deposition was
      taken before me at the time and place stated
 9    in the foregoing styled cause with the
      appearances as noted;
10
11          2.   Being a Court Reporter, I
      then reported the deposition in Stenotype to
12    the best of my skill and ability, and the
      foregoing pages contain a full, true and
13    correct transcript of my said Stenotype notes
      then and there taken;
14          3.   I am not in the employ of and
      am not related to any of the parties or their
15    counsel, and I have no interest in the matter
      involved.
16          WITNESS MY SIGNATURE, this, 31st
17    day of August, 2010.
18
19
20          _____
            MONNA J. MCCORMICK, RPR, CLR, CRR
21          Court Reporter
            Notary Public
22          for the State of
            Tennessee at Large   ***
23          License No.:  161

24          My commission expires:
            November 2, 2013
```

195

Deposition of Johnnie Williams

```
 1              CHANGES AND SIGNATURE
 2    PAGE  LINE  CHANGE            REASON
 3    ____  ____  _____
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25    ____  ____  _____
```

196

Deposition of Johnnie Williams

```
 1        I, JOHNNIE WILLIAMS, have read the foregoing
 2    Deposition and hereby affix my signature that same is
 3    True and correct, except as noted above.
 4
 5                         _____
 6                         JOHNNIE WILLIAMS
 7
 8    THE STATE OF Tennessee      )
 9    COUNTY OF Shelby            )
10
11        Before me, Lela R. Canter    , on this day
12    personally appeared JOHNNIE WILLIAMS, known to me or
13    proved to me on the oath of _____ or
14    through _____ (description of
15    identity card or other document) to be the person
16    whose name is subscribed to the foregoing instrument
17    and acknowledged to me that he/she executed the same
18    for the purpose and consideration therein expressed.
19        Given under my had and seal of office on this
20    23rd day of September   , 2010  .
21
22                         _____
23                         NOTARY PUBLIC IN AND FOR
24                         THE STATE OF
25    My Commission Expires: 12/12/2012
```

Exhibit D

Deposition Outline
Johnnie Williams
August 24. 2010

I. Personal Information

    A. Name
        1. Johnnie J. Williams (p.13, ln 23)
    B. Address
        1. 1863 South Wellington (p.14, ln 1)
    C. Employment
        1. Current
            a. Vice president and sales manager with **American Drum & Pallet, Inc** since 2003 (p.15, ln 4-14; p.16, ln, 8-12)
                1) Incorporated in Delaware (p.17, ln 11-15 & ln.20-23)
                2) Company recycled drums, pallets and tote tanks for sale. Cleaned metal and plastic fifty-five gallon drums and thirty gallon drums (p.24, ln 1-22)
                3) Operated on a business where reconditioned drums were ordered by clients during the July- August agricultural season (p.26, ln 16 – p.27, ln 6)
                    a) Sometimes operated under contract with other drum container companies that were short on drums (p.28, ln 3-5; p.29, ln 2-6) but these container companies never supplied JW with drums to be cleaned (p.29, ln 7-9)
            b. JW's responsibilities comprises of selling reconditioned drum and pellet (p.15, ln 20 – p.16, ln 3)
            c. JW describes himself as self-employed, but there are questions if he meets the definition of self-employment (p.14, ln.17-20; p.15, ln. 4-5; p.180, ln 18 – p.181 ln 14)
            d. JW does not read or write very well and depends on Grover Gray to help him in business (p.181 ln 19 – p.185, ln 22)
                1) Mr. Gray is the comptroller and handles all the paperwork (p.21, ln 20-21)
            e. Corporate officers included JW's son, Michael Williams, his daughter, Angela Williams, and Glover Gray (p.21, ln 17-18)
                1) Michael Williams was president of both companies but left in 2005 or 2006 for Haz/Mat work with Federal Express (p. 33, ln 13-15; p.34, ln 2-21)
                    a) Clarification on presidency of corporation @ 806 Walnut Street (p.191, ln 15-24)
                2) Angela Williams was the secretary for both companies but left in 2005 or 2006 for work at Internal Revenue Service (p.35 ln8-12, ln22- p.36 ln1)

# Exhibit D

       f. JW, Michael Williams, Angela Williams. and Glover Gray all shareholders
          (p.21, ln 22 – p.22, ln 4)

  2. **American Drum & Pallet Company, Inc**.
      a. Separate company from above (p.16, ln.16-19)
          1) Incorporated in Tennessee (p.16, ln 23 – p.17, ln 4; p.17,
             ln 16-19)
      b. JW considers two companies the same (p.17 ln.16-22)
      c. JW's title and responsibilities same at both companies (p.18, ln 3-8)
      d. Corporate officers included JW's son, Michael Williams and his daughter,
         Angela Williams. (p.18, ln 11-19)
          1) Michael Williams was president of both companies but left
             in 2005 or 2006 for Haz/Mat work with Federal Express (p 33, ln 13-
             15; p.34, ln 2-21)
          2) Angela Williams was the secretary for both companies but left in 2005
             or 2006 for work at Internal Revenue Service (p.35 ln8-12, ln 22- p.36
             ln1)

  3. JW was **NOT** employed by Drums, Incorporated,
      a. Company owned by JW's nephew, George Stanford Roebuck
      b. Company operated at 806 Walnut Street – the same address as
         American Drum & Pallet Company, Inc (p.22, ln 16 – p.23, ln 7)
  4. The only two companies JW affiliated with at 806 Walnut Street are
      American Drum & Pallet Inc and American Drum & Pallet Company, Inc (p.32, ln 17-
      22)

D. Education
  1. High school and a year of Coahoma Junior college in auto mechanics (Clarksdale,
    MS) (p.14, ln 9-13; p.181, ln 15-19)
  2. Mr. Williams does not read or write very well. He depends on Glover Gray to help him
    in business (p. 181 ln. 19 – p. 185, ln. 22)

E. Family
  1. Wife
      a) Cancer, diabetic and thyroid removal ( p.186, ln 2-5)
      b) Nurse and breadwinner (p.186, ln 6-10)
  2. Brothers and sisters
      a) Sick (p.186, ln 16-24)
      b) Brother moved in with JW (p.186, ln 13-15)

F. Health
  1. JW has prostate cancer (p.185, ln 23 – p.186, ln 2)

G. Religion
  1. Christian (p.122 ln.1)


II. American Drum & Pallet, Inc. vs. American Drum & Pallet Company, Inc

# Exhibit D

A. Same business with the same operation, hours, employees and location (p.29, ln 10-22; p.30 ln 3-4)
B. Main employees for both companies (p.30, ln 13 – p.32, ln 4)
      1. James Wilkerson (supervisor)
      2. Leroy Smith (truck driver)
      3. Charles Wilkerson,(machine operator)
      4. Dorothy Williamson (machine operator & maintenance)
      5. Sylvester Wilkerson (manual labor)
      6. Sammy Flake (manual labor)
C. When Mr. Harbin refers to American Drum & Pallet, he is speaking of both American Drum & Pallet Inc and American Drum & Pallet Company, Inc. He further clarifies that 806 Walnut Street includes reference to 0 Heiskell Place parcel to American Drum & Pallet facility (p36 ln 11-24)

III. American Drum & Pallet facility

A. Clarification on the scope of services provided by American Drum (p.37 ln7; p.38 ln 5)
      1. Companies that bought steel drums (p.54, ln 13– p.55, ln 17)
      2. Companies that bought plastic drums (p.55, ln 18– p.56, ln 7)
      3. American Drum and contracts (p.180 ln 2-17)
      4. On "getting an order" (p.178 ln 22 – p.180, ln 1)
      5. Reconditioning & selling pallets (p.177, ln 13 – p.178, ln 17)
B. Definitions:
      1. Drum hustler (p.38, ln 21 – p.39, ln 21; p.140 ln 13-24)
      2. Drums and containers (p.48, ln 21– p.50, ln 9; p.51, ln 17– p.53, ln 5)
      3. Distinction between recycling and reconditioning (p.177 ln 1-9)
C. Discussion on cleaning process of drums (p.38, ln 8-20; p.39, ln 22 – p.40, ln 1-2; p.41, ln 17-24; p.42, ln 19 – p.44 ln 6)
      1. Quantity of drums/ tote tanks cleaned (p.42, ln 14-18; p.50, ln 23 – p.51, ln 9)
      2. Drying process of drums (p.44, ln 10-16; p.46, ln 3 – p.47 ln 23)
D. Drum acceptance/inspection program (p.40, ln 3-24; p.166, ln 1 – p.167, ln 21; p.66, ln 16 – p.69, ln 20; p.75, ln 3 – p.77, ln 3; p.78, ln11 – p.79, ln 7)
E. Receptor tank (p.44, ln 23 – p.45, ln 3)
F. Painting process of drums (p.48, ln 2-10)
      1. Disposal of gas rags (p.56, ln 15 – p.57, ln 11; p.97, ln 9-13; p.160, ln 6 – p.162, ln 18; p.174, ln 8 – p.176, ln 24)
G. Grinding and crushing of drums and containers (p.53, ln 11– p.54, ln 12)
H. Filtration system (p.57, ln 17 – p.61, ln 16)
      1. Disposal of filtration screen residue/waste (p.62, ln 3-7; p.63, ln 5-22; p. 74, ln 3-13; p.96, ln 6-20; p.97, ln 1-8; p.172, ln 4-15)
      2. Testing of filtration screen residue (p.63, ln 23 – p.65, ln 3)
         a) A & L Labs tested filtration residue (p.189 ln 5-12

Exhibit D

I. Chemicals:
      1. Used at facility (p.79, ln 15 – p.82, ln 1; p.83, ln9 – p.84, ln 9)
      2. Used in facility prior American Drum ownership (p.87, ln 11 – p.89, ln 14)
      3. Management (p.80, ln 6-20)
      4. Storage (p.80, ln 21-24)
      5. Trichloroethylene (TCE) (p.84, ln 10-23; p.85 ln 20 – p.87, ln 10; p.163, ln 21 – p.164, ln 21)
      6. Paint, purchase and usage of (p.84, ln 24 – p.85, ln12 & p.85, ln1 4-19)

## IV. **Exhibit 1**

A. Document of response to the Tennessee Department of Environment & Conservation information request by American Drum & Pallet (p.71 ln 6-11; ln 22-23)
B. Glover Gray submitted Exhibit 1 document (p.73, ln 6-10)
C. Document states pickup or drop-off drums are inspected for compliance with EPA standards (p.74, ln 15 – p.75 ln 2)
      1. Establishing time of drum ownership (p.77, ln 4 – p.78, ln 12)
D. Clarification on Exhibit 1 and definition of empty drum (p.187 ln 17 – p.189, ln 4)

## V. **Exhibit 2**

A. Information request (04.05.07) from Tennessee Department of Environment & Conservation (p.73 ln 11-16)

## VI. **Exhibit 3**

A. JW voluntarily provided Mr. Harbin and Ms. Richardson a letter dated August 17, 2010 (p.102, ln 18 –p.103, ln 12; p.104, ln 6-7)
B. JW identifies document (p.104, ln 9-13)
C. Customers that supplied American Drum with drums (p.102, ln 9 – p.103, ln 24)
      1. Rich Foods (p.104, ln 19 – p.106, ln 12)
      2. Smucker's Jelly (p.106, ln 13-19)
      3. CCL (p.106, ln 11-13; p.113, ln 12 – p.114, ln 8)
      4. Flying Tiger (p. 106, ln 13-19; p.119, ln 12 – p.121, ln 4; p.126, ln 2-11)
      5. Newlywed Foods (p.108, ln 4-23)
      6. Pepsi Cola Bottling (p.108, ln 24 – p.109, ln 9)
      7. Leonard's Recycling (p.109, ln 21 – p.110, ln 8)
      8. Precision Technology (p.110, ln 22 – p.111, ln 11)
      9. Hanco Manufacturing (p.111, ln 12 – p.112, ln 3)
      10. Jack Flint & Son (p.112, ln 4-10)
      11. Jackson Oil Company (p.112, ln 11-17)
      12. Kenny & Associates (p.112, ln 18 – p.113, ln 4)
      13. Chemical Specialty (p.113, ln 5-10; p.129, ln 17-23)
      14. Farris Calhoun Paints (p.114, ln 9-20)

# Exhibit D

15. Tri-State Agricultural (p.115, ln 15 – p.116 ln 2)
16. Sweeney Airport & Sweeney Flying (p.116, ln 3 – 119 ln 7)
17. Parker Hannisan (p.121, ln 6-22)
18. Lincoln, Inc (p.121, ln 23 – p.122, ln 6)
19. Yellow Freight (p.122 ln 7 – p.123, ln 6)
20. Phoenix Zinc, Inc. (p.123, ln 7-22)
21. Gromoor Company (p.123, ln 23 – p.124 ln 11)
22. Piper Impack (p.124, ln 12 – p.125, ln 23)
23. Kraft Foods Nabisco (p.129, ln 24 – p.131, ln 6)
24. Hershey Chocolate, USA (p.131, ln 7 – p.132, ln 7)
25. Dee's Oil Company (p.132, ln 11 – p.133, ln 6)
26. Asplundh (p.142, ln 13 – p.145, ln 8)
D. Discussion on Monsanto, Dupont, Asplundh, American Fireworks (p.126, ln 13 – p.129 ln 7; p.132, ln 9)


VII. **Exhibit 4**

A. Introduction of a photograph of Pepsi cola drums (p. 109, ln 10-19)


VIII. Current Case

A.EPA inspection/cleanup (p.95, ln 14-23; p.141, ln 16 – p.142, ln10)
1. Great Dane drums (p.97, ln 20 – p.100, ln 20)
a) Already on premise at the time of facility purchase (p.159, ln 12 – p.160 ln 3)
b) Clarification on placement of Great Dane drums (p.190 ln 13 – p. 191 ln 14)
2. EPA and drum removal (p.173, ln 21 – p.174, ln 7)
B. Methyl parathion and Flying Tiger (p.89, ln 11 – p.95, ln13)
C. Pioneer Cabinet Company (p.100, ln 21 – p.101, ln 15)
D. List of companies that bought drums from American drum (p.133, ln 8 – p.135 ln  19)
E. American Drum and insurance coverage (p.135, ln 20 – p137 ln 2)
F. Current operational status on American Drum (p.137, ln 3-14; p.148, ln 11 – p. 153 ln 5)
1. Clarification on operations (p.192, ln 1-16)
G. American Drum and hazardous waste (p.137, ln 15 – p.138, ln 12)
1. RCRA hazardous waste determination (p.189, ln 13-19)
H. Fiber board/drum containers:
1. at facility (p.137, ln 13 – p.139, ln 22)
2. description of (p.145, ln 20 – 147, ln 6)
I. American Drum, EPA, and customers (p.147, ln 16 – p.148, ln 10)
J. JW's testimony on placement of containers with residue (p.153, ln 6-18)
K. JW's testimony on doing business with crop dusters (p.153, ln 19 – p.154, ln 5)
L. JW's testimony on residue and CCL drums (p.154, ln 6 – p.155, ln 5)
M. JW's testimony on paying for drums:
1. American Drum paid two dollars a drum to Smucker, Rich Foods, Farrell

Exhibit D

Calhoun, and Nabisco Kraft (p.155, ln 6 – p.156, ln 5)
      2. Difference in paying or not paying for drums (p.156, ln 6 – p.157, ln 1)
      3. On selling drums (p.157, ln 2 – 158, ln 19)
      4. Clarification on paying for drums (p.164, ln 5 – p.165 ln 24)
N. American Drum's total revenue for FY 2006 was in the range of $200,000 but last year, had zero revenues (p.158 ln 20 – p.159, ln 11)
O. Discussion on drums left on premises with unknown contents (p.162, ln 19 – p. 163, ln 13)
P. City of Memphis water pollution and American Drum (p.168, ln 17 – p.173, ln 17)
      1. In 2000, American Drum contacted a Mr. Gay in Nashville for assistance (p.167, ln 23 – p.168, ln 16)
           a) Clarification if Mr. Gay was State of TN employee or EPA (p.189 ln 20 – p.190 ln 5)

Exhibit D